Edith HONIGMAN, individually and on behalf of all Class B stockholders of the Green Giant Company, Plaintiff,

v.

GREEN GIANT COMPANY, a Minnesota corporation; J. J. Babb, E. C. Brown, E. B. Cosgrove, R. C. Cosgrove, W. F. Dietrich, L. E. Felton, T. G. Harrison, J. P. Houck, C. P. Jaffray, M. H. Morris, A. D. Radebaugh, G. C. Scott, A. R. Upgren, L. C. Volling, and C. S. Vrtis, individually and as Directors of the Green Giant Company; Minnesota Valley Corporation, a Minnesota corporation; and First National Bank of Minneapolis, a national banking corporation, Defendants.

No. 4-60-Civ.-176.

United States District Court
D. Minnesota,
Fourth Division.
Aug. 22, 1961.

Maurice S. Binkow and Jonathan Sobeloff, of Honigman, Miller & Schwartz, Detroit, Mich., and Bert M. Gross, of Phillips & Gross, Minneapolis, Minn., appeared in behalf of plaintiff.

John J. McKasy, of Thompson, Hessian, Fletcher & McKasy, Minneapolis, Minn., appeared in behalf of defendants.

Walter P. North, Gen. Counsel, Mr. David Ferber, Asst. Gen. Counsel, and Faith Colish, Attorney, Securities and Exchange Commission, Washington, D. C., filed a brief amicus curiae.

NORDBYE, District Judge.

This cause came before the Court for trial without a jury. Jurisdiction is based upon diversity of citizenship.

The plaintiff, Edith Honigman, a resident and citizen of Michigan, is the owner of 1,570 shares of Class B non-voting stock in the defendant company, a Minnesota corporation. She allegedly brings this action in behalf of herself and all other Class B stockholders, and derivatively in behalf of the corporation against the company and its Directors, to set aside the issuance of so-called premium shares to Class A stockholders in a plan of recapitalization of the company, or in the alternative to set aside the entire plan. In her amended com-

plaint, she requests that if it is not feasible to cancel the plan in its entirety by reason of the conduct of defendants in its consummation, said plan should stand, except that the consideration received by each Class A stockholder for the sharing of voting rights in the company with other Class B stockholders beyond a fair consideration, should be returned to the corporation. But in her brief plaintiff states that she is entitled to the cancellation of the premium shares issued to the Class A shareholders, or in the alternative the cancellation of the entire plan.

The plan was submitted to all of the shareholders by a written notice mailed to them on or about June 17, 1960. The meeting of the shareholders to vote on the plan was called for July 15, 1960. After receiving the notice, and before the date of the meeting, plaintiff commenced this action and presented a motion in this Court for a temporary injunction restraining the holding of the meeting called to approve the plan. Her motion was denied.

The Green Giant Company is engaged in the growing, processing, and selling of vegetables and food products. As of 1914 in the early history of the company, it had a handful of employees, including one Edward B. Cosgrove, with annual sales of some $7,000. In about 1918, Mr. Cosgrove became General Manager; in 1929, President; and in 1954, Chairman of the Board. At the end of its fiscal year on March 31, 1960, the company and a wholly owned subsidiary had sales in excess of $64,000,000 for that year and a net worth of $23,462,544. It had outstanding 21,233 shares of 5 per cent cumulative preferred stock, with a par value of $100 per share; 44 shares of Class A common stock; and 428,998 shares of Class B stock. The Class A stock had all the voting rights and a majority of these shares, 26 in number, were owned by Edward B. Cosgrove. The capital stock of the company never had been listed on any exchange, and the dealings in its stock were channeled largely through and by the Minnesota Valley Corporation in over-the-counter transactions.

In 1959 the Board of Directors of the company, by resolution, authorized the employment of Glore, Forgan & Co., investment bankers of Chicago, Illinois, to make a study of the capital structure of the company and prepare a report and recommendation to the Board. Although the company had made marked success in its business enterprises, there had been a growing feeling that a recapitalization of the company whereby the voting rights would be held by all the common shareholders would not only benefit the shareholders, but advantages of considerable magnitude would likewise inure to the company. One of the partners of Glore, Forgan & Co. was a Mr. Vrtis, who was a member of the Green Giant Company Board of Directors. His company had had dealings with the Green Giant Company some time before there was any consideration of the recapitalization of the company. There is an absence of any showing that any influence was brought to bear on Mr. Vrtis by Mr. Cosgrove or the Directors with reference to the treatment of the Class A stockholders in any recapitalization which should be proposed. It is reasonable to find from the evidence that this banking concern and Mr. Vrtis, as well as the Directors, approached their task with commendable objectivity and with a desire to propose a plan that would be fair and equitable and which would be acceptable to all concerned. In view of the marked disparity in the market value of the stock of those who were in control of the company, as compared with the non-voting B shares, the problems confronting the promoters of any plan of recapitalization in formulating a plan which would be fair and impartial was not a simple undertaking. From the beginning, Glore, Forgan & Co. attempted to formulate a plan which would give the Class B shareholders immediate conversion into voting shares and a gradual conversion into such shares to the Class A shareholders. Originally, the plan contemplated a conversion based upon the earnings

of the company, but due to the apparent uncertainties involved by reason of such prerequisites and the apprehension as to certain tax problems, a new plan was formulated and presented to the Board of Directors as of May 23, 1960. Under this plan, Class A and Class B shares were to be exchanged for a new class of voting common stock. Each Class B shareholder was to receive one share of the new common stock for each share of the Class B stock. Each Class A shareholder was to receive ten shares of what is termed convertible common stock, each of which would be converted annually into one hundred new voting shares, and in this manner, after the confirmation of the plan and at the end of a ten-year period, the holders of 44 shares of Class A stock would receive 44,000 shares of the new common stock. Under the plan, the present Class B stockholders would have 49.37 per cent of the voting power upon its adoption, and over the ten-year period, the percentage in voting power yearly would increase until by the tenth year it would be 90.70 per cent. The participation of the Class A shareholders in the assets of the company under the plan would be increased from about .01 per cent to 9.3 per cent.

On July 15, 1960, the plan was submitted to the Class A and Class B shareholders and was approved by all of the Class A shareholders and by the holders of 395,982 shares or 92.3 per cent of all the outstanding Class B stock. 4,799 of Class B shares were voted against it. Upon the approval of the plan, steps were taken to change the shares on the basis thereof. The necessary amendments to the Articles of Incorporation have been completed under Minnesota law and put into effect, and convertible common stock and the common stock have been issued as provided by the plan. Following the adoption of the plan, all of the new common voting stock was split on a two for one basis. It appears that all of the Class B shareholders who voted against the plan, except the plaintiff, have exchanged their shares for certificates representing the new common shares.

After the plan was adopted, and the split of common shares on the basis of two for one was effected, the value of the share interest represented by the old Class B shareholders increased on the market by more than 33⅓ per cent. On November 1, 1960, a merger of the Michigan Mushroom Company and the Green Giant Company was consummated under the terms of which the Green Giant Company issued to the former stockholders of the Michigan Company 3,000 shares of Green Giant preferred stock and 35,-200 shares of the new common stock.

Plaintiff contends that the issuance of the premium stock under the plan to the Class A shareholders is unfair, illegal and void for the following reasons: (1) The Green Giant Company and the Class B shareholders were not adequately compensated for the issuance of these premium shares; (2) the Class A shareholders did not part with anything of substantial value in exchange for the shares they received; (3) corporate practice and ethics forbid the taking by the Class A shareholders of such a premium; (4) the Class A shareholders in reality are not surrendering control under the plan; (5) the plan violates Sections 301.15 and 301.16, Minnesota Statutes Annotated; (6) the Class A shareholders by merely surrendering their control of the Green Giant Company may not profit at the expense of the company and the Class B shareholders because the Class A shareholders are in the position of fiduciaries; (7) the notice and letter sent to the Class B shareholders notifying them of the recapitalization is false and misleading and in violation of the anti-fraud provisions of the Federal Securities Act and the Minnesota Blue Sky Act.

It seems wholly unrealistic to suggest, as plaintiff does, that the Class A shareholders should be relegated to the same number of shares in the recapitalization of the company when they forego the exclusive voting control which they maintained as Class A shareholders. That the market of the Class A shares far exceeded the market value of the

same number of Class B shares is uncontradicted. It appears from the evidence that, before there was any consideration of any recapitalization of the company, Mr. Edward B. Cosgrove received an offer for his controlling interest in the Class A stock of some $2,000,000. Moreover, there is evidence of a wholly independent appraisal made by the American National Bank of St. Paul, which acted as Trustee of a trust in which there were five shares of the Class A stock. This stock was sold by the bank before the recapitalization for $7,500 per share. In fact, it would appear that no one questioned the premium rights of the Class A shareholders in any recapitalization wherein they gave up their exclusive voting control until plaintiff instituted this proceeding. One may theorize on the principles of so-called corporate democracy and urge that no premium should be paid for its extension, and further contend that because the book value of the Class A shares does not exceed the book value of the Class B shares, these two classes of stock would have the basis of equality in any recapitalization; however, in doing so, one ignores the undeniable disparity in the market value of the two classes of common stock. No Class A shareholder could be expected to forego the power of control of a company of this size without receiving in return a consideration commensurate with the value of the control which he foregoes. It seems evident, therefore, that in light of the evidence in considering the fairness of the plan, we must commence with the premise that the A shareholders in surrendering their exclusive voting rights were entitled to a premium in exchanging their stock for the new voting common stock. It would be wholly unreasonable to expect that any recapitalization of the company could be effected in affording equal voting to all of the common stock which did not result in some dilution of the equity of the B stockholders. Plaintiff, however, refuses to concede this premise and contends that any issuance of stock premium is immoral and legally reprehensible. She

urges that any premium paid to the A shareholders would illegally dilute the corporate assets to the detriment of the B shareholders and that the corporation could not issue any premium shares to the A shareholders because no consideration had passed to the company for the issuance of such stock. Plaintiff urges that the company received neither cash nor any other property, tangible or intangible, in consideration for the ultimate issuance of the 44,000 shares which the A shareholders would receive at the end of the ten-year period.

It may well be that in any recapitalization if changes in the stock structure are made, with stock premiums being issued to those who share their exclusive voting rights with other shareholders, there must be a showing of fairness and validity, not only to the class of stockholders who hold no voting rights, but to the corporation as well. And here, where the proposers of the plan are Directors who were elected by the A stockholders, it seems entirely fair to place the burden of proof upon the defendants to sustain the plan's fairness. Directors are fiduciaries in certain transactions of a corporation, and no doubt as to certain dealings with its stockholders. Whether these Directors are fiduciaries in the strict sense in the promotion of this recapitalization need not be determined. It does seem reasonable, however, to find that the burden rests upon the Directors who propose the recapitalization to establish its fairness to the non-assenting B stockholders. Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 50 A.L.R.2d 1134. True, it would appear that, in the absence of fraud or violation of any fiduciary relationship, the wisdom and fairness of any plan of recapitalization formulated according to state law primarily would be a matter for the stockholders to determine in effecting such recapitalization, particularly when it must be recognized that material benefits flow to the B stockholders from the recapitalization and to the corporation as well. At least, under these circumstances the judgment of the vast major-

ity of the stockholders affected should be accorded great weight.

A corporation which lodges its voting plan in a small group of stockholders does not produce a healthy corporate situation, and this is true with reference to the Green Giant Company, although under the management of the A stockholders, the company achieved outstanding business success. However, the death of Edward B. Cosgrove, or the sale of his stock to others who then would have control of the company, might produce a situation which would be extremely detrimental to the future of the company. The fact that the apparent sagacity and business acumen of Mr. Cosgrove and his associates has resulted in such outstanding success of the company does not mean that others in control would produce the same result or that they would not attempt to mulct the company to the aggrandizement of themselves and to the detriment of the B stockholders. Moreover, the unique and abnormal corporate structure of this company would naturally deter desirable personnel from throwing in their lot with such a company by reason of the power that was lodged in a small minority group of stockholders. Consequently, it must be recognized that any dilution of the interest in the corporate equity of the B stockholders in this recapitalization is not without its counterpart of benefit to them. Certainly, the holders of 92.3 per cent of the Class B stock who voted for the plan must have recognized the benefits which would inure to them with voting rights in a soundly reorganized company. And although the increase in the value of the Class B shares of some 33⅓ per cent immediately after the recapitalization may have been due in part to the two for one split in the new stock, and possibly to some extent due to the general market advance in food stock companies generally in 1960, there can be little doubt that the reorganization itself was the major factor in the market increase of the new voting stock.

Although the ratio of 1,000 to 1 for the A stock in exchange for the new voting stock which will be the ultimate result at the end of the ten-year period may seem liberal, it must be borne in mind that there were only 44 shares of Class A stock outstanding, and that these new shares had an abnormal market value. In these 44 shares was lodged the entire destiny of the company. It was the power of control which was lodged in these few shares which created their value, and if the power of control had been vested in a larger number of shares, the ratio would have been proportionately less. But regardless of the ratio and return to the A stockholders— whether they were 44 shares in number or 44,000 shares in number—the increased equity of the Class A stockholders in the company did not exceed 9.3 per cent.

Plaintiff questions the reasonableness of the allocation of the same premium to each of the A shares in that it was Edward B. Cosgrove who controlled the voting stock by reason of his ownership of 26 shares of Class A stock. Therefore, she urges that the Class A shareholders, other than Edward B. Cosgrove, were not entitled to any premium even though the premium shares to him could be sustained. However, it would seem that any attempt to differentiate as among the A shareholders in any recapitalization would be indefensible. None of the A shareholders challenge the fairness of the equal treatment accorded the minority A shareholders, and there is convincing evidence that the value of all the A stock exceeded the value of the convertible common stock issued to the A shareholders.

Plaintiff refers to Subdivision 1 of Section 301.15, Minnesota Statutes Annotated, which provides,

"Consideration. No shares shall be allotted except in consideration of cash, or other property, tangible or intangible, received or to be received by the corporation, or services rendered or to be rendered to the corporation, or of an amount transferred from surplus to stated capital upon a share dividend."

And also to Subdivision 1 of Section 301.16, Minnesota Statutes Annotated, which provides,

"Unfair allotment. Shares with or without par value shall not be allotted for a cash consideration which is unfair to the then shareholders nor for a consideration other than cash upon a valuation thereof which is unfair to such shareholders."

The subsequent subdivisions of Section 301.15 provide:

"Subd. 2. Resolution stating value. At the time of each allotment of shares the shareholders or directors making such allotment shall state by resolution their determination of the fair value to the corporation in monetary terms of any consideration other than cash for which shares with or without par value are allotted.

"Subd. 3. Limitation of consideration. The amount of consideration to be received, in cash or otherwise, shall not be less than the par value of shares so allotted, nor less than the stated capital to be represented by shares without par value so allotted. The provisions of this subdivision shall not apply to shares of its own stock acquired by the corporation, nor to shares of the corporation having par value allotted in consideration of the cancelation of an indebtedness of such corporation the amount of which is at least equal to the par value of the shares so allotted, unless the consideration received by such corporation upon the creation of such indebtedness was less than 85 per cent of the amount of such indebtedness.

"Subd. 4. Shares wrongfully allotted. If shares are allotted in violation of the provisions of subdivision 3 of this section, the person to whom such shares are allotted and his assignees with notice, and shareholders and directors voting in favor of such allotment, shall be liable to the corporation for the benefit of all persons thereafter becoming creditors who did not assent thereto and are damaged thereby, to the extent of their damages, not exceeding the difference between the par value of shares having a par value so allotted, or the stated capital to be represented by shares without par value so allotted, and the fair value to the corporation of the consideration therefor; provided, that the person to whom such shares were allotted, or his assignees, shall not be liable under the provisions of this subdivision if he received such shares in good faith and without actual knowledge of the violation of subdivision 3 of this section; and, provided, further, that directors and shareholders shall be liable only if they wilfully or without reasonable investigation voted in favor of such allotment.

"Subd. 5. Actions, when commenced. No action shall be maintained under the provisions of this section unless commenced within three years from the date on which such allotment was made. In any such action creditors shall not be presumed to have extended credit to the corporation relying upon the compliance by the corporation with the provisions of this section relating to allotment of shares and the consideration to be received therefor."

The subsequent subdivisions of Section 301.16 provide:

"Subd. 2. Liability for unfair allotments. Directors or shareholders who, wilfully without reasonable investigation, either make an allotment of shares for a cash consideration which is unfair to the then shareholders or so overvalue property or services received or to be received by the corporation as consideration for shares allotted, shall be jointly and severally liable to the corporation for the benefit of the then shareholders who did not as-

sent to and are damaged by such action, to the extent of their damages; provided, that if shares or securities convertible into shares or securities in connection with which options are granted to purchase or subscribe for shares, shall, before allotment or offer of such shares or securities is made to others, be offered in substantially ratable amounts to the then shareholders who, in the absence of waiver of such rights, would be entitled to preemptive rights, at not more than the same considerations and terms as such shares or securities are allotted or offered to others, the portion of such shares or securities not subscribed for within the offering period by such shareholders may, at any time within four months after the expiration of the offering period, be allotted or sold to others at not less than the same considerations and terms, and any such allotment or sale shall, except in case of deliberate fraud, be conclusively presumed to have been fair. Such prior offer to shareholders shall be made by not less than 60 days' notice mailed to them at their addresses as shown by the records of the secretary of the corporation. Directors or shareholders who are present and entitled to vote but fail to vote against such allotment or valuation shall be considered, for the purposes of this section, as participating in such allotment or valuation.

"Subd. 3. Contribution. Any director or shareholder against whom a claim is asserted pursuant to this section, except in case of participation in a deliberate fraud, shall be entitled to contribution on an equitable basis from other directors or shareholders who are liable.

"Subd. 4. Action, when commenced. No action shall be maintained against a director or shareholder under the provisions of this section unless commenced within three years from the date on which such allotment was made."

Plaintiff contends that under the showing herein no consideration was received by the corporation for the issuance of the premium shares. At least, she urges that the premium shares were grossly excessive as compared to the intangible considerations which the company received, and hence that the Minnesota statutes referred to afford a basis for equity to step in and either limit the A shareholders to 44 shares of new holding stock, or return to the company any premium above a fair consideration, or in the alternative that the entire recapitalization should be set aside. Although these two statutes assume to create certain rights in shareholders where there is a dilution of their shares by reason of allotment of shares for a consideration which is unfairly low, it should be pointed out that the plaintiff here is not seeking any recovery of damages which apparently is the underlying purpose of these statutes, and it may be doubtful whether this recapitalization creates an "allotment" of shares within the purview of these statutes. Moreover, plaintiff has not shown that she sustained any damage. Her stock has appreciated in value by reason of the recapitalization. But, in any event, these statutes may be given due consideration in determining whether or not in equity this recapitalization is to be sustained. Obviously, to determine the value of this recapitalization to the corporation and to attempt to spell out in dollars and cents that which the corporation received as a so-called consideration for the premium stock presents practical difficulties. However, it seems undeniable that the corporation received benefits by reason of the plan. On account of the unique corporate structure, this corporation was saddled with definite limitations in any attempt to expand, to develop, to obtain equity financing, or to merge with other companies, and the progress made by the present management was no assurance that such development would

continue in the future. These facts must have been the motivating considerations in the near unanimous vote of the Class B shareholders who favored the plan. The Class B stock, with no voting rights, was not listed on any of the country's exchanges. Any mergers or consolidations by Green Giant with other companies upon which the entire future of the defendant company might depend were closed to it. This fact was adequately demonstrated when immediately after the recapitalization the company was able to effect a merger with the Michigan Mushroom Company, which merger would have been quite impossible before the recapitalization. Of course, it is true that the Class B shareholders are clothed with the privilege to maintain their preemptive right in the corporate equity. But no recapitalization could be effected without some dilution of their interest in the corporate equity. Consequently, if it is fair and reasonable under the plan that, because of the benefits the Class B stockholders would receive, they should release some of their share in the corporate equity to the Class A shareholders, such benefits to the Class B stockholders obviously enter into the consideration which the Class A stockholders gave for their stock premium.

■ After due consideration, the Court is satisfied that a fair analysis of all the circumstances justifies a finding that defendants have sustained the burden of proof in establishing that the premium shares issued to the Class A stockholders is commensurate with the benefit received by the corporation and that the plan is fair and reasonable to the Class B stockholders. The Court concludes that the consideration flowing to the corporation fairly satisfies any demands of the Minnesota statutes relied upon, as well as the basic principles of fair dealing required by equity. No doubt persons may differ as to the best way to capitalize this company. But no one can deny that some plan was imperative. Here, we have no plan or scheme or artifice by the Class A shareholders or the Directors to persuade unfairly the Class B stockholders into approval of the plan. Other corporations confronted with problems which seem reasonably comparable may have accomplished their recapitalization with methods which differ from the manner under consideration herein. But merely because Green Giant has not followed the pattern of other companies in its recapitalization does not stamp this plan as inequitable or unfair. It does not seem necessary to discuss other situations cited by counsel where somewhat similar problems have been considered. And the Court cannot ignore the persuasive fact that the holders of 92.3 per cent of all outstanding Class B stock concluded that the plan was fair to them and likewise to the corporation. That fact speaks more persuasively than the arguments of those who attempt to theorize on unrealistic principles of so-called corporate democracy. No one contends that the Class B stockholders were not fully informed of the Class A stock control when they invested in the company stock, and so far as the charge of immoral and reprehensible conduct directed at the Class A stockholders is concerned, suffice it to say that their position in this proceeding must be judged by that which businessmen of ordinary prudence would have done under similar circumstances. The integrity of the Class A stock is not challenged here.

Plaintiff urges, however, in addition, that the notice and letter to the shareholders notifying the Class B shareholders of the meeting called to approve the plan was incomplete and misleading. She assumes to support her contention in this regard by setting forth that (1) the notice failed to disclose the extent to which the Class A shareholders would retain control under the plan; (2) that it failed to state the holdings of the Class B stock by Class A shareholders which would be exchanged for the new voting common stock; (3) that the notice failed to disclose Edward B. Cosgrove's holdings of Class A shares and his family's

large holdings of Class B shares; (4) the failure to mention in the notice the consideration paid to Glore, Forgan & Co. for their services; (5) the failure to state that the Directors who had approved the plan were all elected by the Class A shareholders; (6) the statement in the notice that if the plan was favorably acted upon, the Board declared its intention to vote for a two for one stock split, and that this phase of the notice was deceptive because it tended to encourage a

vote in favor of the plan; (7) the failure of the notice to disclose that the main reason for the plan was the fact that Edward B. Cosgrove held a majority of the Class A shares; and (8) the failure to state why the 1,000 to 1 split premium for the Class A shares was reasonable rather than some other ratio.

It seems apparent that the attack on the notice and letter regarding the meeting to consider the plan, which is recited in the footnote,[1] as being fraudulent, in-

1. "GREEN GIANT COMPANY
"Le Sueur, Minnesota
"NOTICE OF SPECIAL MEETING OF CLASS 'A' AND CLASS 'B' COMMON STOCKHOLDERS

"A special meeting of the Class 'A' and Class 'B' common stockholders of Green Giant Company will be held at the Company's office in Le Sueur, Minnesota, at 2:30 o'clock P.M. (C.D.T.), on July 15, 1960, to consider and take action on a proposal to amend Articles III and VI of the Articles of Incorporation, and to amend Article I, Sections 2, 4 and 5, and Article V of the By-Laws, to accomplish a Plan of Recapitalization of the Company approved and recommended by the Board of Directors. There follows a letter summarizing the Plan, together with a copy of the proposed amendments. Each of the above classes of stockholders will vote separately on the proposal.

"Under Minnesota law no matter of business not referred to in this Notice may be transacted at the meeting.

"The close of business on June 15, 1960 has been fixed as the record date for determining the stockholders entitled to receive notice of and to vote at the meeting.

"Whether or not you expect to attend this meeting, you are urged to date and sign the enclosed proxy and return it to us as promptly as possible in the enclosed envelope, for which no postage is required.
"June 17, 1960
"L. C. Volling, Secretary"
"To all Holders of Common Stock of Green Giant Company:

"You are cordially invited to attend the Special Meeting of Green Giant Stockholders which will be held at 2:30 P.M. on July 15, 1960 at the Company's office in Le Sueur, Minnesota. The purpose of this meeting is to consider a plan of recapitalization which has as its ultimate aim the creation of a single class of common stock with the sole voting rights. This, in the opinion of your management, is necessary to meet the Company's future needs.

"The common stock capitalization of your Company, outstanding at the end of the March 31, 1960 fiscal year, was as follows:
44 shares Class 'A' Common Stock; 428,998 shares Class 'B' Common Stock.

"The Class 'A' stock has the entire voting rights in the Company subject only to contingent voting rights of the Preferred Stock. The Class 'A' stock ranks equally on a per share basis as to assets and dividends with the Class 'B' stock. The Class 'B' stock has no voting rights.

"It is felt that in past years this capitalization has been extremely beneficial, enabling the Company to progress to a prominent position in the canning industry. However, your officers and directors feel that this type of capital structure has now become outmoded and will work to the future disadvantage of the stockholders and of the Company.

"There are sound business reasons why it is now essential to have the voting rights in the Company vested in all of the Common Stock. The proposed Plan of Recapitalization will do this. A more marketable stock would be created. Marketability and the resulting spreading of ownership would particularly aid the Company in attracting and retaining executive personnel. A widely held voting stock would also promote expansion opportunities which might become available through acquisitions involving Green Giant Company stock. Finally, and above all, improved marketability would clearly be helpful in raising additional equity capital as needed.

"For these reasons, your Directors feel that if the Company is to make the greatest possible progress in the future, it is necessary that all Common Stock should

764

eventually carry voting rights. A year ago the Board retained the nationally known investment banking firm of Glore, Forgan & Co. to study the problems inherent in our present capitalization and to make suggestions with respect thereto. To accomplish the desired result that firm has recommended the plan outlined below.

"The proposed Plan of Recapitalization briefly provides as follows:

"1. *Initial Basis of Exchange:* Each share of present Class 'B' common stock shall be exchanged for one share of new voting Common Stock. Each share of the present Class 'A' common stock shall be exchanged for ten shares of new Convertible Common Stock. As the result, there would initially be outstanding 428,-998 shares of Common Stock and 440 shares of Convertible Common Stock.

"2. *Conversion:* The Convertible Common Stock will be automatically converted into Common Stock over a ten year period at the rate of 100 common shares for every convertible share. One-tenth of the Convertible Common Stock initially outstanding will be converted each year. At the end of ten years (disregarding any stock dividends or splits) the outstanding Common Stock capitalization would consist of 472,998 shares —all of one class with full voting rights.

"3. *Voting:* The Common Stock will have one vote per share, a total of 428,998 votes for the class as a whole. The Convertible Common Stock will have 1,000 votes per share, a total of 440,000 votes for the class as a whole, declining as annual conversions take place. Upon full conversion, the holders of the present Class 'A' Common Stock will have 44,000 votes, or 9.3% of the voting power.

"4. *Liquidation:* The Common Stock and Convertible Common Stock will rank equally, on a share for share basis, in any liquidation or distribution of assets. In any proposed liquidation or sale of substantially all assets, the Common Stock and Convertible Common Stock will vote as classes, and the affirmative vote of the holders of at least two-thirds of the outstanding shares of each class will be required.

"5. *Dividends:* The Common Stock and Convertible Common Stock shall participate equally, on a share for share basis, in any cash dividends and, in shares of the respective class, in any stock dividends or stock splits which may be declared by the Board of Directors.

"6. *Merger or Consolidation:* In a merger or consolidation, the conversion rights of the Convertible Common Stock will be protected; that is, each share shall be convertible thereafter, over a time period no longer than that remaining under the Plan, into 100 units of whatever is issued for one unit of the Common Stock by the terms of the merger or consolidation.

"In essence, the Plan provides that the owners of the present Class 'B' Stock will immediately acquire 49.4% of the total vote and eventually acquire 90.7% of the vote. The owners of the present Class 'A' Stock will reduce their share of the total vote from the present 100% to an eventual 9.3%, acquiring in exchange therefor an ultimate 9.3% interest in the equity. After ten years the Company will have a single class of Common Stock, each share of which will be voting.

"The Plan has been unanimously approved by the Board of Directors, including members owning or representing in the aggregate substantial amounts of stock of both classes, as being in the best interests of the Company and all of its stockholders. Your management unqualifiedly recommends approval.

"The Company has obtained a favorable ruling from the Bureau of Internal Revenue holding that the proposed changes in the capitalization of the Green Giant Company will constitute a 'reorganization' so that no taxable gain or loss would be recognized to any stockholder or the Green Giant Company. A copy of the ruling will be sent to you upon request.

"The Board of Directors believes that the market for your stock would be additionally improved if a greater number of shares were outstanding. In the event the Plan is acted upon favorably, the Board has declared its intention to vote a 2 for 1 stock split, resulting in the issuance of one additional share of each class for each share then outstanding. While the number of each would be doubled over those contained in this letter, the relationships (of equity, vote, etc.) would be exactly the same as outlined.

"If there is any further information you would like, we hope you will let us know.

complete and misleading is without substance. Certainly it is significant that there is an absence of any testimony by any Class B stockholder that he or she was misled or deceived by the wording of the notice or the plan, or that any Class B stockholder was not possessed of all the necessary information which plaintiff now urges should have been included therein. The notice to the stockholders invited requests for further information. When plaintiff protested the fairness of the plan in writing before it was submitted, she was informed that any further information she desired regarding it would be forthcoming upon her request, but she remained silent and contented herself with the institution of this suit.

The argument that the family, relatives and friends of Edward B. Cosgrove will continue in control of the company is without any foundation in fact. Undoubtedly during the remaining period when Edward B. Cosgrove may interest himself in certain affairs of the company, there will be a coterie of friends, relatives, etc., who may be prompted to be guided by his views as to the best interest of the company by reason of confidence in the policies advocated by him. Such confidence and loyalty would be bottomed upon his successful administration in the past. But to suggest that he or the former Class A shareholders will retain control of the new voting shares is entirely speculative. Mr. Cosgrove is well over seventy-two years of age. He held some 25,000 shares of Class B stock before recapitalization. He is no longer the active head of this company, and to assume that because he and some of his relatives and friends held Class B shares, the notice to the Class B stockholders should have included that information is without merit. The same observation may be made regarding the

failure to set forth in the notice all of the holdings by the Class A shareholders of Class B stock. As stated, Mr. Cosgrove held 25,056 shares of Class B stock before the recapitalization. Some 60,000 Class B shares, including those held by Mr. Cosgrove, were owned by the Class A stockholders. The holdings of Class B stock by the Class A shareholders and those held by the Directors were far less than a majority of the outstanding Class B shares. Certainly, it was not necessary to include in the notice that the Board of Directors were elected by the Class A stockholders. That fact must have been self-evident, and the very purpose of the recapitalization was to rid the corporation of that limited control. However, it may be pointed out here that, according to the by-laws, the majority of the Board before the recapitalization had to be selected from the outside, so to speak. They could not be employees or officers of the company.

There is an absence of any showing that justifies a finding that the contemplated split of two for one after the plan was approved was prompted by some devious scheme and plan to lure the Class B stockholders into an approval of the plan by holding out to them the contemplated split. So far as the evidence indicates, that after-phase of the reorganization was sound corporate practice, and the absence of any attempt to convince the Class B stockholders that the 1,000 to 1 ratio was more reasonable than some other ratio cannot be the basis for any just criticism of the notice.

In the supplemental complaint herein, plaintiff alleges as follows:

"That defendants breached their fiduciary duties as directors and controlling stockholders by failing to fairly disclose the facts as to the actual effect of their plan upon the

---

"There is attached hereto notice of the Special Meeting to be held in Le Sueur, Minnesota, on July 15, 1960, together with a copy of the amendments which require your approval to make the Plan ef-

fective. We sincerely urge that you sign and return the enclosed Proxy promptly.
  "Yours sincerely,
"Edw. B. Cosgrove        "L. E. Felton
  Chairman of the Board        President"
"June 17, 1960
  Le Sueur, Minnesota"

distribution of voting rights in the Green Giant Company; that by reason of said failure to disclose, and by reason of certain implied and actual misrepresentations as to the reasons for their plan and the impartiality of its sponsors, as well as the misrepresentations set forth in Paragraph 9 of the original Bill of Complaint herein, defendants, as principals, co-conspirators and controlling persons, violated Sections 12 and 17 of the Securities Act of 1933, Section 14 [should be Section 10] of the Securities Exchange Act of 1934, and the Minnesota Blue Sky Law."

Plaintiff relies upon Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q, Section 10 of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and the Minnesota Blue Sky Law. Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q, provides in part:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

\* \* \* \* \* \*

"(c) The exemptions provided in section 3 shall not apply to the provisions of this section."

Section 10 of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78j (b), provides in part:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails,

\* \* \*

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

After this case was submitted, the Securities and Exchange Commission filed a motion for leave to file a brief amicus curiae. At the hearing on the motion, the Court deferred any final ruling, stating that it would consider the brief and then determine whether the motion should be granted. The brief has been considered and it may be filed herein as requested by the Commission. It does not seem necessary, however, to indulge in any extended discussion of the position of the Commission or of the plaintiff regarding the Federal securities laws. The Court has found heretofore that there was no fraud, misleading statements, or omission of any statement of material facts within the purview of the pertinent statutes referred to by the plaintiff and the Commission. The Court, therefore, concludes that this recapitalization under State law of a company whose stock is not listed on any national exchange, and where there is an absence of any showing that any provisions of the Federal Securities Act have been violated, plaintiff is not entitled to any relief on the basis thereof.

So far as the Minnesota Blue Sky Law is concerned, plaintiff refers to Section 80.225, Minnesota Statutes Annotated, which provides, in part, that "any device \* \* \* for obtaining any \* \* \* property by means of any false \* \* \* representation \* \* \* of a

present existing fact or otherwise" may be enjoined by any court of competent jurisdiction upon application of the Commissioner of Securities. Plaintiff reasons that a sale in violation of the Blue Sky Law is void and civil relief is granted thereunder to a private party such as plaintiff. However, there is no violation here of any provision of the Blue Sky Law. That seems apparent without any further statement.

Findings of fact and conclusions of law consistent herewith may be submitted by the defendants on ten days' notice. An exception is reserved.