# UNITED STATES *v.* BYRUM, EXECUTRIX

No. 71–308.   Argued March 1, 1972—Decided June 26, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, STEWART, MARSHALL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post,* p. 151.

*Matthew J. Zinn* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Crampton, Loring W. Post,* and *Donald H. Olson.*

*Larry H. Snyder* argued the cause and filed a brief for respondent.

*Simon H. Rifkind, Adrian W. DeWind, James B. Lewis,* and *Maurice Austin* filed a brief for Gilman et al., Executors, as *amici curiae* urging affirmance.

MR. JUSTICE POWELL delivered the opinion of the Court.

Decedent, Milliken C. Byrum, created in 1958 an irrevocable trust to which he transferred shares of stock in three closely held corporations. Prior to transfer, he owned at least 71% of the outstanding stock of each corporation. The beneficiaries were his children or, in the event of their death before the termination of the trust, their surviving children. The trust instrument specified that there be a corporate trustee. Byrum designated as sole trustee an independent corporation, Huntington National Bank. The trust agreement vested

in the trustee broad and detailed powers with respect to the control and management of the trust property. These powers were exercisable in the trustee's sole discretion, subject to certain rights reserved by Byrum: (i) to vote the shares of unlisted stock held in the trust estate; (ii) to disapprove the sale or transfer of any trust assets, including the shares transferred to the trust; (iii) to approve investments and reinvestments; and (iv) to remove the trustee and "designate another corporate Trustee to serve as successor." Until the youngest living child reached age 21, the trustee was authorized in its "absolute and sole discretion" to pay the income and principal of the trust to or for the benefit of the beneficiaries, "with due regard to their individual needs for education, care, maintenance and support." After the youngest child reached 21, the trust was to be divided into a separate trust for each child, to terminate when the beneficiaries reached 35. The trustee was authorized in its discretion to pay income and principal from these trusts to the beneficiaries for emergency or other "worthy need," including education.[1]

---

[1] The Trust Agreement in pertinent part provided:

"Article IV. Irrevocable Trust.

"This Trust shall be irrevocable and Grantor reserves no rights, powers, privileges or benefits either as to the Trust estate or the control or management of the trust property, except as set forth herein.

"Article V. Powers Of The Trustee.

"The Trustee shall have and possess and may exercise at all times not only the rights, powers and authorities incident to the office or required in the discharge of this trust, or impliedly conferred upon or vested in it, but there is hereby expressly conferred upon and vested in the Trustee all the rights, powers and authorities embodied in the following paragraphs in this Article, which are shown by way of illustration but not by way of limitation:

. . . . .

"Sell. 5.02 To sell at public or private sale, to grant options to sell, to exchange, re-exchange or otherwise dispose of all or part of

When he died in 1964, Byrum owned less than 50% of the common stock in two of the corporations and 59% in the third. The trust had retained the shares

the property, real or personal, at any time belonging to the Trust Estate, upon such terms and conditions and for such consideration as said Trustee shall determine, and to execute and deliver all instruments of sale or conveyance necessary or desirable therefor.

.       .       .       .       .

"Investments. 5.05  To invest any money in the Trust Estate in stocks, bonds, investment trusts, common trust funds and any other securities or property, real or personal, secured or unsecured, whether the obligations of individuals, corporations, trusts, associations, governments, expressly including shares and/or obligations of its own corporation, or otherwise, either within or outside of the State of Ohio, as the Trustee shall deem advisable, without any limitation whatsoever as to the character of investment under any statute or rule of law now or hereafter enacted or existing regarding trust funds or investments by fiduciaries or otherwise.

"Voting. 5.06  To vote by proxy or in person any stock or security comprising a part of the Trust Estate, at any meeting, except that, during Grantor's lifetime, all voting rights of any stocks which are not listed on a stock exchange, shall be exercised by Grantor, and after Grantor's death, the voting rights of such stocks shall be exercised by Grantor's wife during her lifetime.

.       .       .       .       .

"Leases. 5.09  To make leases for any length of time, whether longer or shorter than the duration of this Trust, to commence at the present time or in the future; to extend any lease; to grant options to lease or to renew any lease; it being expressly understood that the Trustee may grant or enter into ninety-nine year leases, renewable forever.

.       .       .       .       .

"Income Allocation. 5.13  To determine in its discretion how all receipts and disbursements, capital gains and losses, shall be charged, credited or apportioned between income and principal.

.       .       .       .       .

"Limitation. 5.15  Notwithstanding the powers of the Trustee granted in paragraphs 5.02, 5.05, 5.09 and 5.11 above, the Trustee shall not exercise any of the powers granted in said paragraphs unless (a) during Grantor's lifetime said Grantor shall approve of the action taken by the Trustee pursuant to said powers, (b) after the

transferred to it, with the result that Byrum had continued to have the right to vote not less than 71% of the common stock in each of the three corpora-

---

death of the Grantor and as long as his wife, Marian A. Byrum, shall live, said wife shall approve of the action taken by the Trustee pursuant to said powers.

"Article VI.   Distribution Prior To Age 21.

"Until my youngest living child reaches the age of twenty-one (21) years, the Trustee shall exercise absolute and sole discretion in paying or applying income and/or principal of the Trust to or for the benefit of Grantor's child or children and their issue, with due regard to their individual needs for education, care, maintenance and support and not necessarily in equal shares, per stirpes. The decision of the Trustee in the dispensing of Trust funds for such purposes shall be final and binding on all interested persons.

"Article VI.   Division At Age 21.

.                .                .                .                .

"Principal Disbursements. 6.02   If prior to attaining the age of thirty-five (35), any one of the children of Grantor shall have an emergency such as an extended illness requiring unusual medical or hospital expenses, or any other worthy need including education of such child, the Trustee is hereby authorized and empowered to pay such child or use for his or her benefit such amounts of income and principal of the Trust as the Trustee in its sole judgment and discretion shall determine.

.                .                .                .                .

"Article VIII.   Removal of Trustee.

"If the Trustee, The Huntington National Bank of Columbus, Columbus, Ohio, shall at any time change its name or combine with one or more corporations under one or more different names, or if its assets and business at any time shall be purchased and absorbed by another trust company or corporation authorized by law to accept these trusts, the new or successor corporation shall be considered as the said The Huntington National Bank of Columbus, Ohio, and shall continue said Trusts and succeed to all the rights, privileges, duties and obligations herein conferred upon said The Huntington National Bank of Columbus, Columbus, Ohio, Trustee.

"Grantor, prior to his death, and after the death of the Grantor, the Grantor's wife, Marian A. Byrum, during her lifetime, may remove or cause the removal of The Huntington National Bank of Columbus, Ohio, or any successor Trustee, as Trustee under the

tions.[2]   There were minority stockholders, unrelated to Byrum, in each corporation.

Following Byrum's death, the Commissioner of Internal Revenue determined that the transferred stock was properly included within Byrum's gross estate under § 2036 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 2036 (a).   That section provides for the inclusion in a decedent's gross estate of all property which the decedent has transferred by *inter vivos* transaction, if he has retained for his lifetime "(1) the possession or enjoyment of, or the right to the income from, the property" transferred, or "(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income

---

Trusts and may thereupon designate another corporate Trustee to serve as successor Trustee hereunder.

"Article IX.   Miscellaneous Provisions.

.          .          .          .          .

"Discretion. 9.02   If in the opinion of the Trustee it shall appear that the total income of any beneficiary of any Trust fund created hereunder is insufficient for his or her proper or suitable support, care and comfort, and education and that of said beneficiary's children, the Trustee is authorized to pay to or for such beneficiary or child such additional amounts from the principal of the Trust Estate as it shall deem advisable in order to provide suitably and properly for the support, care, comfort, and education of said beneficiary and of said beneficiary's children, and the action of the Trustee in making such payments shall be binding on all persons."

[2] The actual proportions were:

|  | Percentage Owned by Decedent | Percentage Owned by Trust | Total Percentage Owned by Decedent and Trust |
|---|---|---|---|
| Byrum Lithographing Co., Inc. | 59 | 12 | 71 |
| Graphic Realty, Inc. | 35 | 48 | 83 |
| Bychrome Co. | 42 | 46 | 88 |

therefrom." [3]  The Commissioner determined that the stock transferred into the trust should be included in Byrum's gross estate because of the rights reserved by him in the trust agreement.  It was asserted that his right to vote the transferred shares and to veto any sale thereof by the trustee, together with the ownership of other shares, enabled Byrum to retain the "enjoyment of . . . the property," and also allowed him to determine the flow of income to the trust and thereby "designate the persons who shall . . . enjoy . . . the income."

The executrix of Byrum's estate paid an additional tax of $13,202.45, and thereafter brought this refund action in District Court.  The facts not being in dispute, the court ruled for the executrix on cross motions for summary judgment.  311 F. Supp. 892 (SD Ohio 1970).  The Court of Appeals affirmed, one judge dissenting.  440 F. 2d 949 (CA6 1971).  We granted the Government's petition for certiorari.  404 U. S. 937 (1971).

## I

The Government relies primarily on its claim, made under § 2036 (a)(2), that Byrum retained the right to

---

[3] 26 U. S. C. § 2036 provides:

"(a)  General rule.

"The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

"(1) the possession or enjoyment of, or the right to the income from, the property, or

"(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom."

designate the persons who shall enjoy the income from the transferred property. The argument is a complicated one. By retaining voting control over the corporations whose stock was transferred, Byrum was in a position to select the corporate directors. He could retain this position by not selling the shares he owned and by vetoing any sale by the trustee of the transferred shares. These rights, it is said, gave him control over corporate dividend policy. By increasing, decreasing, or stopping dividends completely, it is argued that Byrum could "regulate the flow of income to the trust" and thereby shift or defer the beneficial enjoyment of trust income between the present beneficiaries and the remaindermen. The sum of this retained power is said to be tantamount to a grantor-trustee's power to accumulate income in the trust, which this Court has recognized constitutes the power to designate the persons who shall enjoy the income from transferred property.[4]

At the outset we observe that this Court has never held that trust property must be included in a settlor's gross estate solely because the settlor retained the power

---

[4] *United States* v. *O'Malley*, 383 U. S. 627 (1966).

It is irrelevant to this argument how many shares Byrum transferred to the trust. Had he retained in his own name more than 50% of the shares (as he did with one corporation), rather than retaining the right to vote the transferred shares, he would still have had the right to elect the board of directors and the same power to "control" the flow of dividends. Thus, the Government is arguing that a majority shareholder's estate must be taxed for stock transferred to a trust if he owned at least 50% of the voting stock after the transfer or if he retained the right to vote the transferred stock and could thus vote more than 50% of the stock. It would follow also that if a settlor controlled 50% of the voting stock and similarly transferred some other class of stock for which the payment of dividends had to be authorized by the directors, his estate would also be taxed. Query: what would happen if he had the right to vote less than 50% of the voting stock but still "controlled" the corporation? See n. 10, *infra*.

to manage trust assets. On the contrary, since our decision in *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339 (1929), it has been recognized that a settlor's retention of broad powers of management does not necessarily subject an *inter vivos* trust to the federal estate tax.[5] Although there was no statutory analogue to § 2036 (a)(2) when *Northern Trust* was decided, several lower court decisions decided after the enactment of the predecessor of § 2036 (a)(2) have upheld the settlor's right to exercise managerial powers without incurring estate-tax liability.[6] In *Estate of King* v. *Commissioner*, 37 T. C. 973 (1962), a settlor reserved the power to direct the trustee in the management and investment of trust assets. The Government argued that the settlor was thereby empowered to cause investments to be made in such a manner as to control significantly the flow of income into the trust. The Tax Court rejected this argument, and held for the taxpayer. Although the court recognized that the settlor had reserved "wide latitude in the exercise of his discretion as to the types of investments to be made," *id.*, at 980, it did not find this control over the flow of income to be equivalent

---

[5] The Court has never overturned this ruling. See *McCormick* v. *Burnet*, 283 U. S. 784 (1931); *Helvering* v. *Duke*, 290 U. S. 591 (1933) (affirmed by an equally divided Court). In *Commissioner* v. *Estate of Church*, 335 U. S. 632 (1949), and *Estate of Spiegel* v. *Commissioner*, 335 U. S. 701 (1949), the Court invited, *sua sponte*, argument of this question, but did not reach the issue in either opinion.

[6] See, *e. g.*, *Old Colony Trust Co.* v. *United States*, 423 F. 2d 601 (CA1 1970); *United States* v. *Powell*, 307 F. 2d 821 (CA10 1962); *Estate of Ford* v. *Commissioner*, 53 T. C. 114 (1969), aff'd, 450 F. 2d 878 (CA2 1971); *Estate of Wilson* v. *Commissioner*, 13 T. C. 869 (1949) (*en banc*), aff'd, 187 F. 2d 145 (CA3 1951); *Estate of Budd* v. *Commissioner*, 49 T. C. 468 (1968); *Estate of Pardee* v. *Commissioner*, 49 T. C. 140 (1967); *Estate of King* v. *Commissioner*, 37 T. C. 973 (1962).

to the power to designate who shall enjoy the income from the transferred property.

Essentially the power retained by Byrum is the same managerial power retained by the settlors in *Northern Trust* and in *King.* Although neither case controls this one—*Northern Trust,* because it was not decided under § 2036 (a)(2) or a predecessor; and *King,* because it is a lower court opinion—the existence of such precedents carries weight.[7] The holding of *Northern Trust,* that the settlor of a trust may retain broad powers of management without adverse estate-tax consequences, may have been relied upon in the drafting of hundreds of *inter vivos* trusts.[8] The modification of this principle now sought by the Government could have a seriously adverse impact, especially upon settlors (and their estates) who happen to have been "controlling" stock-

[7] The dissenting opinion attempts to distinguish the cases, holding that a settlor-trustee's retained powers of management do not bring adverse estate-tax consequences, on the ground that management of trust assets is not the same as the power retained by Byrum because a settlor-trustee is bound by a fiduciary duty to treat the life tenant beneficiaries and remaindermen as the trust instrument specifies. But the argument that in the reserved-power-of-management cases there was "a judicially enforceable strict standard capable of invocation by the trust beneficiaries by reference to the terms of the trust agreement," *post,* at 166, ignores the fact that trust agreements may and often do provide for the widest investment discretion.

[8] Assuming, *arguendo,* that MR. JUSTICE WHITE is correct in suggesting that in 1958, when this trust instrument was drawn, the estate-tax consequences of the settlor's retained powers of management were less certain than they are now, this Court's failure to overrule *Northern Trust,* plus the existence of recent cases such as *King* and the cases cited in n. 6, have undoubtedly been relied on by the draftsmen of more recent trusts with considerable justification. Our concern as to this point is not so much with whether Byrum properly relied on the precedents, but with the probability that others did rely thereon in good faith.

holders of a closely held corporation. Courts properly have been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far-reaching consequences. When a principle of taxation requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules lest they be subsequently overturned. Legislative enactments, on the other hand, although not always free from ambiguity, at least afford the taxpayers advance warning.

The Government argues, however, that our opinion in *United States* v. *O'Malley,* 383 U. S. 627 (1966), compels the inclusion in Byrum's estate of the stock owned by the trust. In *O'Malley,* the settlor of an *inter vivos* trust named himself as one of the three trustees. The trust agreement authorized the trustees to pay income to the life beneficiary or to accumulate it as a part of the principal of the trust in their "sole discretion." The agreement further provided that net income retained by the trustees, and not distributed in any calendar year, " 'shall become a part of the principal of the Trust Estate.' " *Id.,* at 629 n. 2. The Court characterized the effect of the trust as follows:

> "Here Fabrice [the settlor] was empowered, with the other trustees, to distribute the trust income to the income beneficiaries or to accumulate it and add it to the principal, thereby denying to the beneficiaries the privilege of immediate enjoyment and conditioning their eventual enjoyment upon surviving the termination of the trust." *Id.,* at 631.

As the retention of this legal right by the settlor, acting as a trustee "in conjunction" with the other trustees,

came squarely within the language and intent of the predecessor of § 2036 (a)(2), the taxpayer conceded that the original assets transferred into the trust were includable in the decedent's gross estate. *Id.*, at 632. The issue before the Court was whether the accumulated income, which had been added to the principal pursuant to the reservation of right in that respect, was also includable in decedent's estate for tax purposes. The Court held that it was.

In our view, and for the purposes of this case, *O'Malley* adds nothing to the statute itself. The facts in that case were clearly within the ambit of what is now § 2036 (a). That section requires that the settlor must have "retained for his life . . . (2) the *right* . . . to designate the persons who shall possess or enjoy the property or the income therefrom." O'Malley was covered precisely by the statute for two reasons: (1) there the settlor had reserved a legal right, set forth in the trust instrument; and (2) this right expressly authorized the settlor, "in conjunction" with others, to accumulate income and thereby "to designate" the persons to enjoy it.

It must be conceded that Byrum reserved no such "right" in the trust instrument or otherwise. The term "right," certainly when used in a tax statute, must be given its normal and customary meaning. It connotes an ascertainable and legally enforceable power, such as that involved in *O'Malley*.[9] Here, the right ascribed to Byrum was the power to use his majority position and influence over the corporate directors to "regulate the flow of dividends" to the trust. That "right" was

---

[9] Although Mr. Justice White's dissent argues that the use of the word "power" in *O'Malley* implies that the Court's concern was with practical reality rather than legal form, an examination of that opinion does not indicate that the term was used other than in the sense of *legally* empowered. At any rate, the "power" was a right reserved to the settlor in the trust instrument itself.

neither ascertainable nor legally enforceable and hence was not a right in any normal sense of that term.[10]

Byrum did retain the legal right to vote shares held by the trust and to veto investments and reinvestments. But the corporate trustee alone, not Byrum, had the right to pay out or withhold income and thereby to designate who among the beneficiaries enjoyed such income. Whatever power Byrum may have possessed with respect to the flow of income into the trust was derived not from an enforceable legal right specified in the trust instrument, but from the fact that he could elect a majority of the directors of the three corporations. The power to elect the directors conferred no legal right to command them to pay or not to pay dividends. A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests.[11] Moreover,

---

[10] The "control" rationale, urged by the Government and adopted by the dissenting opinion, would create a standard—not specified in the statute—so vague and amorphous as to be impossible of ascertainment in many instances. See n. 13, *infra*. Neither the Government nor the dissent sheds light on the absence of an ascertainable standard. The Government speaks vaguely of drawing the line between "an unimportant minority interest" (whatever that may be) and "voting control." The dissenting opinion does not address this problem at all. See Comment, Sale of Control Stock and the Brokers' Transaction Exemption—Before and After the Wheat Report, 49 Tex. L. Rev. 475, 479–481 (1971).

[11] Such a fiduciary relationship would exist in almost every, if not every, State. Ohio, from which this case arises, is no exception:

"[I]f the majority undertakes, either directly or indirectly, through the directors, to conduct, manage, or direct the corporation's affairs, they must do so in good faith, and with an eye single to the best interests of the corporation. It is clear that the interests of the majority are not always identical with the interests of all the shareholders. The obligation of the majority or of the dominant group of shareholders acting for, or through, the corporation is fiduciary in nature. A court of equity will grant appropriate relief where the

the directors also have a fiduciary duty to promote the interests of the corporation.[12]  However great Byrum's influence may have been with the corporate directors, their responsibilities were to all stockholders and were enforceable according to legal standards entirely unrelated to the needs of the trust or to Byrum's desires with respect thereto.

The Government seeks to equate the *de facto* position of a controlling stockholder with the legally enforceable "right" specified by the statute.  Retention of corporate control (through the right to vote the shares) is said to be "tantamount to the power to accumulate income" in the trust which resulted in estate-tax consequences in *O'Malley*.  The Government goes on to assert that "[t]hrough exercise of that retained power, [Byrum] could increase or decrease corporate dividends . . . and thereby shift or defer the beneficial enjoyment of trust income." [13]  This approach seems to us

majority or dominant group of shareholders act in their own interest or in the interest of others so as to oppress the minority or commit a fraud upon their rights."  13 Ohio Jur. 2d, Corporations § 662, pp. 90–91 (footnotes omitted).

See *Overfield* v. *Pennroad Corp.*, 42 F. Supp. 586 (ED Pa. 1941), rev'd on other grounds, 146 F. 2d 889 (CA3 1944).

[12] "The directors of the corporation represent the corporation, not just one segment of it, but all of it.  The fiduciary nature of the directors' obligation requires that, in the management of the corporation's affairs, they do not presume to play favorites among the shareholders or among classes of shareholders."  12 Ohio Jur. 2d, Corporations § 497, p. 618.

[13] The Government uses the terms "control" and "controlling stockholder" as if they were words of art with a fixed and ascertainable meaning.  In fact, the concept of "control" is a nebulous one.  Although in this case Byrum possessed "voting control" of the three corporations (in view of his being able to vote more than 50% of the stock in each), the concept is too variable and imprecise to constitute the basis *per se* for imposing tax liability under § 2036 (a).  Under most circumstances, a stockholder who has the right to vote

not only to depart from the specific statutory language,[14] but also to misconceive the realities of corporate life.

There is no reason to suppose that the three corporations controlled by Byrum were other than typical small businesses. The customary vicissitudes of such enterprises—bad years; product obsolescence; new competition; disastrous litigation; new, inhibiting Government regulations; even bankruptcy—prevent any certainty or predictability as to earnings or dividends. There is no assurance that a small corporation will have a flow of net earnings or that income earned will in fact be available for dividends. Thus, Byrum's alleged *de facto* "power to

more than 50% of the voting shares of a corporation "controls it" in the sense that he may elect the board of directors. But such a stockholder would not control, under the laws of most States, certain corporate transactions such as mergers and sales of assets. Moreover, control—in terms of effective power to elect the board under normal circumstances—may exist where there is a right to vote far less than 50% of the shares. This will vary with the size of the corporation, the number of shareholders, and the concentration (or lack of it) of ownership. See generally 2 L. Loss, Securities Regulation 770–783 (1961). Securities law practitioners recognize that possessing 10% or more of voting power is a factor on which the Securities and Exchange Commission relies as one of the indicia of control. SEC, Disclosure to Investors—The Wheat Report 245–247 (1969).

[14] In advocating this *de facto* approach, the Government relies on our opinion in *Commissioner* v. *Sunnen*, 333 U. S. 591 (1948). *Sunnen* was a personal income tax case in which the Court found the taxpayer had made an assignment of income. The reasoning relied on the *de facto* power of a controlling shareholder to regulate corporate business for his personal objectives. This case is an estate tax case, not an income tax case. Moreover, unlike assignment-of-income cases, in which the issue is who has the power over income, this case concerns a statute written in terms of the "right" to designate the recipient of income. The use of the term "right" implies that restraints on the exercise of power are to be recognized and that such restraints deprive the person exercising the power of a "right" to do so.

control the flow of dividends" to the trust was subject to business and economic variables over which he had little or no control.

Even where there are corporate earnings, the legal power to declare dividends is vested solely in the corporate board. In making decisions with respect to dividends, the board must consider a number of factors. It must balance the expectation of stockholders to reasonable dividends when earned against corporate needs for retention of earnings. The first responsibility of the board is to safeguard corporate financial viability for the long term. This means, among other things, the retention of sufficient earnings to assure adequate working capital as well as resources for retirement of debt, for replacement and modernization of plant and equipment, and for growth and expansion. The nature of a corporation's business, as well as the policies and long-range plans of management, are also relevant to dividend payment decisions.[15] Directors of a closely held, small corporation must bear in mind the relatively limited access of such an enterprise to capital markets. This may require a more conservative policy with respect to dividends than would be expected of an established corporation with securities listed on national exchanges.[16]

---

[15] The spectrum of types of corporate businesses, and of permissible policies with respect to the retention of earnings, is broad indeed. It ranges from the public utility with relatively assured and stable income to the new and speculative corporation engaged in a cyclical business or organized to exploit a new patent or unproved technology. Some corporations pay no dividends at all, as they are organized merely to hold static assets for prolonged periods (*e. g.*, land, mineral resources, and the like). Corporations which emphasize growth tend to low dividend payments, whereas mature corporations may pursue generous dividend policies.

[16] *Thomas* v. *Matthews*, 94 Ohio St. 32, 55–56, 113 N. E. 669, 675 (1916):

"[I]t is the duty of the directors, in determining the amount of net earnings available for the payment of dividends, to take into

Nor do small corporations have the flexibility or the opportunity available to national concerns in the utilization of retained earnings. When earnings are substantial, a decision not to pay dividends may result only in the accumulation of surplus rather than growth through internal or external expansion. The accumulated earnings may result in the imposition of a penalty tax.[17]

These various economic considerations are ignored at the directors' peril. Although vested with broad discretion in determining whether, when, and what amount of dividends shall be paid, that discretion is subject to legal restraints. If, in obedience to the will of the majority stockholder, corporate directors disregard the interests of shareholders by accumulating earnings to an unreasonable extent, they are vulnerable to a derivative suit.[18] They are similarly vulnerable if they make an unlawful payment of dividends in the absence of net earnings or available surplus,[19] or if they fail to exer-

account the needs of the company in its business and sums necessary in the operation of its business until the income from further operations is available, the amount of its debts, the necessity or advisability of paying its debts or at least reducing them within the limits of the company's credit, the preservation of its capital stock as represented in the assets of the company as a fund for the protection of its creditors and the character of its surplus assets, whether cash, credits or merchandise."

[17] Internal Revenue Code of 1954, Subc. G, pt. I, §§ 531–537, 26 U. S. C. §§ 531–537.

[18] Had Byrum caused the board to follow a dividend policy, designed to minimize or cut off income to the trust, which resulted in the imposition of the penalty for accumulated earnings not distributed to shareholders, there might have been substantial grounds for a derivative suit. A derivative suit also would have been a possibility had dividends been paid imprudently to increase the trust's income at the expense of corporate liquidity. Minority shareholders in Ohio may bring derivative suits under Ohio Rule Civ. Proc. 23.1.

[19] In most States, the power to declare dividends is vested solely in the directors. 11 W. Fletcher, Cyclopedia Corporations, c. 58, § 5320. Ohio is no exception, and it limits the authority of directors to pay

cise the requisite degree of care in discharging their duty to act only in the best interest of the corporation and its stockholders.

Byrum was similarly inhibited by a fiduciary duty from abusing his position as majority shareholder for personal or family advantage to the detriment of the corporation or other stockholders. There were a substantial number of minority stockholders in these corporations who were unrelated to Byrum.[20] Had Byrum and the directors violated their duties, the minority shareholders would have had a cause of action under Ohio law.[21] The Huntington National Bank, as trustee, was one of the minority stockholders, and it had both the right and the duty to hold Byrum responsible for any wrongful or negligent action as a controlling stockholder or as a director of the corporations.[22] Although Byrum had reserved the right to remove the trustee, he would have been imprudent to do this when confronted by the

dividends depending on available corporate surplus. Ohio Rev. Code Ann. § 1701.33. Although liability generally exists irrespective of a statute, nearly all States have statutes regulating the liability of directors who participate in the payment of improper dividends. 12 Fletcher, *supra*, c. 58, § 5432. Again, Ohio is no exception. Ohio Rev. Code Ann. § 1701.95.

[20] App. 30–32. In Byrum Lithographing Co., Inc , none of the other 11 stockholders appears to be related by name to Byrum. In Bychrome Co. five of the eight stockholders appear to be unrelated to the Byrums; and in Graphic Realty Co. 11 of the 14 stockholders appear to be unrelated.

[21] See *Wilberding* v. *Miller,* 90 Ohio St. 28, 42, 106 N. E. 665, 669 (1914):

"An arbitrary disregard of the rights of stockholders to dividends or other improper treatment of the assets of the company would be relieved against."

[22] The trust instrument explicitly granted the trustee the power "[t]o enforce, abandon, defend against, or have adjudicated by legal proceedings, arbitration or by compromise, any claim or demand whatsoever arising out of or which may exist against the Trust Estate." App. 10–11.

trustee's complaint against his conduct. A successor trustee would succeed to the rights of the one removed.

We conclude that Byrum did not have an unconstrained *de facto* power to regulate the flow of dividends to the trust, much less the "right" to designate who was to enjoy the income from trust property. His ability to affect, but not control, trust income, was a qualitatively different power from that of the settlor in *O'Malley,* who had a specific and enforceable right to control the income paid to the beneficiaries.[23] Even had Byrum managed to flood the trust with income, he had no way of compelling the trustee to pay it out rather than accumulate it. Nor could he prevent the trustee from making payments from other trust assets,[24] although admittedly there were few of these at the time of Byrum's death. We cannot assume, however, that no other assets would come into the trust from reinvestments or other gifts.[25]

---

[23] The Government cites two other opinions of this Court, in addition to *O'Malley,* to support its argument. In both *Commissioner* v. *Estate of Holmes,* 326 U. S. 480 (1946), and *Lober* v. *United States,* 346 U. S. 335 (1953), the grantor reserved to himself the power to distribute to the beneficiaries the entire principal and accumulated income of the trust at any time. This power to terminate the trust and thereby designate the beneficiaries at a time selected by the settlor, is not comparable to the powers reserved by Byrum in this case.

[24] While the trustee could not acquire or dispose of investments without Byrum's approval, he was not subject to Byrum's orders. Byrum could prevent the acquisition of an asset, but he could not require the trustee to acquire any investment. Nor could he compel a sale, although he could prevent one. Thus, if there were other income-producing assets in the trust, Byrum could not compel the trustee to dispose of them.

[25] In purporting to summarize the basis of our distinction of *O'Malley,* the dissenting opinion states:

"Now the majority would have us accept the incompatible position that a settlor seeking tax exemption may keep the power of income

We find no merit to the Government's contention that Byrum's *de facto* "control," subject as it was to the economic and legal constraints set forth above, was tantamount to the right to designate the persons who shall enjoy trust income, specified by § 2036 (a)(2).[26]

allocation by rendering the trust dependent on an income flow he controls because the general fiduciary obligations of a director are sufficient to eliminate the power to designate within the meaning of § 2036 (a)(2)." *Post,* at 157.

This statement, which assumes the critical and ultimate conclusion, incorrectly states the position of the Court. We do not hold that a settlor "may keep the power of income allocation" in the way MR. JUSTICE WHITE sets out; we hold, for the reasons stated in this opinion, that this settlor did not retain the power to allocate income within the meaning of the statute.

[26] The dissenting opinion's view of the business world will come as a surprise to many. The dissent states:

"Thus, by instructing the directors he elected in the controlled corporations that he thought dividends should or should not be declared Byrum was able to open or close the spigot through which the income flowed to the trust's life tenants." *Post,* at 152.

This appears to assume that all corporations, including the small family type involved in this case, have a regular and dependable flow of earnings available for dividends, and that if there is a controlling stockholder he simply turns the "spigot" on or off as dividends may be desired. For the reasons set forth in this opinion, no such dream world exists in the life of many corporations. But whatever the situation may be generally, the fallacy in the dissenting opinion's position here is that the record simply does not support it. This case was decided on a motion for summary judgment. The record does not disclose anything with respect to the earnings or financial conditions of these corporations. We simply do not know whether there were any earnings for the years in question, whether there was an earned surplus in any of the corporations, or whether—if some earnings be assumed—they were adequate in light of other corporate needs to justify dividend payments. Nor can we infer from the increase in dividend payments in the year following Byrum's death that higher dividends could have been paid previously. The increase could be explained as easily by insurance held by the corporations on Byrum's life.

## II

The Government asserts an alternative ground for including the shares transferred to the trust within Byrum's gross estate. It argues that by retaining control, Byrum guaranteed himself continued employment and remuneration, as well as the right to determine whether and when the corporations would be liquidated or merged. Byrum is thus said to have retained "the . . . enjoyment of . . . the property" making it includable within his gross estate under § 2036 (a)(1). The Government concedes that the retention of the voting rights of an "unimportant minority interest" would not require inclusion of the transferred shares under § 2036 (a)(1). It argues, however, "where the cumulative effect of the retained powers and the rights flowing from the shares not placed in trust leaves the grantor in control of a close corporation, and assures that control for his lifetime, he has retained the 'enjoyment' of the transferred stock." [27]   Brief for United States 23.

It is well settled that the terms "enjoy" and "enjoyment," as used in various estate tax statutes, "are not terms of art, but connote substantial present economic benefit rather than technical vesting of title or estates." *Commissioner* v. *Estate of Holmes,* 326 U. S. 480, 486

---

[27] At one point MR. JUSTICE WHITE seems to imply that Byrum also retained the enjoyment of the right to the income from the transferred shares:

"When Byrum closed the spigot by deferring dividends of the controlled corporations, *thereby perpetuating his own 'enjoyment' of these funds,* he also in effect transferred income from the life tenants to the remaindermen." (Emphasis added.)   *Post,* at 152.

But, of course, even if dividends were deferred, the funds remained in the corporation; Byrum could not use them himself.

(1946).[28]   For example, in *Reinecke* v. *Northern Trust
Co.*, 278 U. S. 339 (1929), in which the critical inquiry
was whether the decedent had created a trust "in-
tended . . . 'to take effect in possession or enjoyment at
or after his death,' " [29] *id.*, at 348, the Court held that re-
served powers of management of trust assets, similar to
Byrum's power over the three corporations, did not sub-
ject an *inter vivos* trust to the federal estate tax.   In
determining whether the settlor had retained the en-
joyment of the transferred property, the Court said:

> "Nor did the reserved powers of management of
> the trusts save to decedent any control over the
> economic benefits or the enjoyment of the prop-
> erty.  He would equally have reserved all these
> powers and others had he made himself the trustee,
> but the transfer would not for that reason have
> been incomplete.   The shifting of the economic
> interest in the trust property which was the subject
> of the tax was thus complete as soon as the trust
> was made.   His power to recall the property and
> of control over it for his own benefit then ceased
> and as the trusts were not made in contemplation

---

[28] See 26 CFR § 20.2036-1 (b) (2):

"The 'use, possession, right to the income, or other enjoyment of
the transferred property' is considered as having been retained by
or reserved to the decedent to the extent that the use, possession,
right to the income, or other enjoyment is to be applied toward
the discharge of a legal obligation of the decedent, or otherwise for
his pecuniary benefit."

Although MR. JUSTICE WHITE questions the Court's failure to
interpret "possession or enjoyment" with "extreme literalness,"
*post*, at 154 n. 3, apparently the Commissioner does not do so either.
Reflection on the expansive nature of those words, particularly
"enjoyment," will demonstrate why interpreting them with "extreme
literalness" is an impossibility.

[29] *Northern Trust* was decided under the Revenue Act of 1921,
§ 402 (c), 42 Stat. 278.

of death, the reserved powers do not serve to distinguish them from any other gift *inter vivos* not subject to the tax." 278 U. S., at 346–347.

The cases cited by the Government reveal that the terms "possession" and "enjoyment," used in § 2036 (a) (1), were used to deal with situations in which the owner of property divested himself of title but retained an income interest or, in the case of real property, the lifetime use of the property. Mr. Justice Black's opinion for the Court in *Commissioner v. Estate of Church,* 335 U. S. 632 (1949), traces the history of the concept. In none of the cases cited by the Government has a court held that a person has retained possession or enjoyment of the property if he has transferred title irrevocably, made complete delivery of the property and relinquished the right to income where the property is income producing.[30]

The Government cites only one case, *Estate of Holland v. Commissioner,* 1 T. C. 564 (1943),[31] in which a decedent had retained the right to vote transferred shares of stock and in which the stock was included

---

[30] *Helvering* v. *Hallock,* 309 U. S. 106 (1940); *Commissioner* v. *Estate of Church,* 335 U. S. 632 (1949); *Lober* v. *United States,* 346 U. S. 335 (1953); *United States* v. *Estate of Grace,* 395 U. S. 316 (1969); *Estate of McNichol* v. *Commissioner,* 265 F. 2d 667 (CA3), cert. denied, 361 U. S. 829 (1959); *Guynn* v. *United States,* 437 F. 2d 1148 (CA4 1971). In all of these cases, as in *Church,* the grantor retained either title or an income interest or the right to use real property for his lifetime.

Despite MR. JUSTICE WHITE's suggestion, *post,* at 154, we have not "ignore[d] the plain language of the statute which proscribes 'enjoyment' as well as 'possession or . . . the right to income.'" Rather, the cases we have cited clearly establish that the terms "possession" and "enjoyment" have never been used as the dissent argues.

[31] The cited opinion supplemented an earlier opinion of the Board of Tax Appeals in the same case, 47 B. T. A. 807 (1942).

within the decedent's gross estate.  In that case, it was not the mere power to vote the stock, giving the decedent control of the corporation, which caused the Tax Court to include the shares.  The court held that " 'on an inclusive view of the whole arrangement, this withholding of the income until decedent's death, coupled with the retention of the certificates under the pledge and the reservation of the right to vote the stock and to designate the company officers' " subjects the stock to inclusion within the gross estate.  *Id.*, at 565. The settlor in *Holland* retained a considerably greater interest than Byrum retained, including an income interest.[32]

As the Government concedes, the mere retention of the right-to-vote shares does not constitute the type of "enjoyment" in the property itself contemplated by § 2036 (a)(1).  In addition to being against the weight of precedent, the Government's argument that Byrum *retained* "enjoyment" within the meaning of § 2036 (a)(1) is conceptually unsound.  This argument implies, as it must under the express language of § 2036 (a), that Byrum "retained for his life . . . (1) the possession or enjoyment" of the *"property"* transferred to the trust or the *"income"* therefrom.  The only property he transferred was corporate stock.  He did not transfer "control" (in the sense used by the Government) as the trust never owned as much as 50% of the stock of any corporation.  Byrum never divested himself of control, as he was able to vote a majority of the shares by virtue of what he owned and the right to vote those placed in

---

[32] A more analogous case is *Yeazel* v. *Coyle*, 68–1 U. S. T. C. ¶ 12,524 (ND Ill. 1968), in which a settlor-trustee, who transferred 60% of the shares of a wholly owned corporation to a trust, was found not to have retained the enjoyment of the property for her lifetime.

the trust. Indeed, at the time of his death he still owned a majority of the shares in the largest of the corporations and probably would have exercised control of the other two by virtue of being a large stockholder in each.[33] The statutory language plainly contemplates retention of an attribute of the property transferred—such as a right to income, use of the property itself, or a power of appointment with respect either to income or principal.[34]

Even if Byrum had transferred a majority of the stock, but had retained voting control, he would not have retained "substantial present economic benefit," 326 U. S., at 486. The Government points to the retention of two "benefits." The first of these, the power to liquidate or

---

[33] The Government, for the reasons discussed in n. 4, *supra,* makes no distinction between retention of control by virtue of owning 50% or more of the voting shares and such retention by a combination of stock owned and that with respect to which the right to vote was retained.

[34] The interpretation given § 2036 (a) by the Government and by MR. JUSTICE WHITE's dissenting opinion would seriously disadvantage settlors in a control posture. If the settlor remained a controlling stockholder, any transfer of stock would be taxable to his estate. See n. 4, *supra.* The typical closely held corporation is small, has a checkered earning record, and has no market for its shares. Yet its shares often have substantial asset value. To prevent the crippling liquidity problem that would result from the imposition of estate taxes on such shares, the controlling shareholder's estate planning often includes an irrevocable trust. The Government and the dissenting opinion would deny to controlling shareholders the privilege of using this generally acceptable method of estate planning without adverse tax consequences. Yet a settlor whose wealth consisted of listed securities of corporations he did not control would be permitted the tax advantage of the irrevocable trust even though his more marketable assets present a far less serious liquidity problem. The language of the statute does not support such a result and we cannot believe Congress intended it to have such discriminatory and far-reaching impact.

merge, is not a *present* benefit; rather, it is a speculative and contingent benefit which may or may not be realized. Nor is the probability of continued employment and compensation the substantial "enjoyment of . . . [the transferred] property" within the meaning of the statute. The dominant stockholder in a closely held corporation, if he is active and productive, is likely to hold a senior position and to enjoy the advantage of a significant voice in his own compensation. These are inevitable facts of the free-enterprise system, but the influence and capability of a controlling stockholder to favor himself are not without constraints. Where there are minority stockholders, as in this case, directors may be held accountable if their employment, compensation, and retention of officers violate their duty to act reasonably in the best interest of the corporation and all of its stockholders.[35] Moreover, this duty is policed, albeit indirectly, by the Internal Revenue Service, which disallows the deduction of unreasonable compensation paid to a corporate executive as a business expense.[36] We conclude that Byrum's retention of voting control was not the retention of the enjoyment of the transferred property within the meaning of the statute.

---

[35] Directors of Ohio corporations have been held liable for payment of excessive compensation. *Berkwitz* v. *Humphrey,* 163 F. Supp. 78 (ND Ohio 1958).

[36] 26 U. S. C. § 162 (a)(1) permits corporations to deduct "reasonable" compensation as business expenses. If the Internal Revenue Service determines that compensation exceeds the bounds of reason, it will not permit a deduction. See, *e. g., Botany Worsted Mills* v. *United States,* 278 U. S. 282 (1929).

Moreover, there is nothing in the record of this case with respect to Byrum's compensation. There is no showing that his control of these corporations gave him an "enjoyment" with respect to compensation that he would not have had upon rendering similar services without owning any stock.

For the reasons set forth above, we hold that this case was correctly decided by the Court of Appeals and accordingly the judgment is

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN join, dissenting.

I think the majority is wrong in all substantial respects.

## I

The tax code commands the payment of an estate tax on transfers effective in name and form during life if the now deceased settlor retained during his life either (1) "the possession or enjoyment of" the property transferred or (2) the right to designate the persons who would enjoy the transferred property or the income therefrom. 26 U. S. C. §§ 2036 (a)(1) and (2). Our cases explicate this congressional directive to mean that if one wishes to avoid a tax at death he must be self-abnegating enough to totally surrender his property interest during life.

> "[A]n estate tax cannot be avoided by any trust transfer except by a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property." *Commissioner* v. *Estate of Church,* 335 U. S. 632, 645 (1949).

In this case the taxpayer's asserted alienation does not measure up to this high standard. Byrum enjoyed the continued privilege of voting the shares he "gave up" to the trust. By means of these shares he enjoyed majority control of two corporations. He used that control to retain salaried positions in both corporations. To my

mind this is enjoyment of property put beyond taxation only on the pretext that it is not enjoyed.

Byrum's lifelong enjoyment of the voting power of the trust shares contravenes § 2036 (a)(2) as well as § 2036 (a)(1) because it afforded him control over which trust beneficiaries—-the life tenants or the remaindermen—would receive the benefit of the income earned by these shares. He secured this power by making the trust to all intents and purposes exclusively dependent on shares it could not sell in corporations he controlled.[1] Thus, by instructing the directors he elected in the controlled corporations that he thought dividends should or should not be declared Byrum was able to open or close the spigot through which income flowed to the trust's life tenants. When Byrum closed the spigot by deferring dividends of the controlled corporations, thereby perpetuating his own "enjoyment" of these funds, he also in effect transferred income from the life tenants to the remaindermen whose share values were swollen by the retained income. The extent to which such income transfers can be effected is suggested by the pay-out record of the corporations here in question, as reflected in the trust's accounts. Over the first five years of its existence on shares later valued by the Internal Revenue Service at $89,000, the trust received a *total* of only $339 in dividends. In the sixth year, Byrum died. The corporations raised their dividend rate from 10¢ a share to $2 per share and paid $1,498 into the trust. See "Income Cash Ledger," App. 25–26.

---

[1] The trust held $89,000 worth of stock in Byrum-controlled corporations and only one other asset: three Series E United States Savings Bonds worth a total of $300 at maturity. See "Yearly List of [Trust] Assets," App. 27–29. Consequently, I do not accord much weight to the majority's point that Byrum could not prevent the trustee from making payments "from other trust assets."

Byrum's control over the flow of trust income renders his estate scheme repugnant to § 2036 (a)(2) as well as § 2036 (a)(1).

To me it is thus clear that Byrum's shares were not truly, totally, "absolutely, unequivocally" alienated during his life. When it is apparent that, if tolerated, Byrum's scheme will open a gaping hole in the estate tax laws, on what basis does the majority nonetheless conclude that Byrum should have his enjoyment, his control, and his estate free from taxes?

## II

I can find nothing in the majority's three arguments purporting to deal with § 2036 (a)(1), that might justify the conclusion that Byrum did not "enjoy" a benefit from the shares his estate now asserts are immune from taxation.

1. The majority says that in *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339 (1929), "the Court held that reserved powers of management of trust assets, similar to Byrum's power over the three corporations, did not subject an *inter vivos* trust to the federal estate tax." This reading of *Northern Trust* is not warranted by the one paragraph in that antique opinion on the point for which it is now cited, see 278 U. S., at 346–347, nor by the circumstances of that case. No one has ever suggested that Adolphus Bartlett, the settlor in *Northern Trust*, used or could have used the voting power of the shares he transferred to a trust to control or, indeed, exercise any significant influence in any company. A mere glance at the nature of these securities transferred by Bartlett (*e. g.*, 1,000 shares of the Northern Trust Co., 784 shares of the Commonwealth Edison Co., 300 shares of the Illinois Central R. Co., 200 preferred shares of the Chicago & North Western R. Co., 300 common shares of the Chicago &

North Western R. Co.) [2] shatters any theory that might lead one to believe that the Court in *Northern Trust* was concerned with anything like the transactions in this case. On what basis, then, does the majority say that *Northern Trust* involved a decision on facts "similar to Byrum's power over the three corporations"? And on what basis does it say that the Government's position that Byrum's use of trust shares to retain control renders those shares taxable is "against the weight of precedent?"

2. The majority implies that trust securities are taxable only if the testator retained title or the right to income from the securities until death. But this ignores the plain language of the statute which proscribes "enjoyment" as well as "possession or . . . the right to income."

3. The majority concludes with the assertion that Byrum secured no "substantial present economic benefits" from his retention of control.[3] It is suggested that con-

---

[2] Transcript of Record 3, in No. 90, O. T. 1928, *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339 (1929).

[3] I am constrained to note that nowhere in the statute (which the majority elsewhere in its argument would read with extreme literalness) do the words "substantial" and "present"—or suggestions to that effect—appear. The phrase "substantial present economic benefit" does appear in *Commissioner* v. *Estate of Holmes,* 326 U. S. 480, 486 (1946), from which it is quoted by the majority. But there the Court held Holmes' estate liable to taxation on the corpus of an irrevocable trust because the settlor (Holmes) had kept the power for himself as trustee to distribute or retain trust income at his discretion. The Court held that this power enabled the settlor to retard or accelerate the beneficiaries' "enjoyment" at his whim. The donor had thus kept "so strong a hold over the actual and immediate enjoyment of what he [allegedly had put] beyond his own power" that he could not be said to have "divested himself of that degree of control which [a provision analogous to § 2036 (a)(2)] requires in order to avoid the tax." 326 U. S., at 487. *Holmes* is thus strong precedent contrary to the majority's § 2036 (a)(2) argument. See also *Lober* v. *United States,* 346 U. S. 335 (1953); it certainly is not a case in

trol is not important, that it either cannot be held by a private shareholder or that it is of so little use and relevance the taxpayer can hardly be said to have "enjoyed" it. This view of corporate life is refuted by the case law;[4] by the commentators;[5] and by everyday transactions on the stock exchange where offers and trades repeatedly demonstrate that the power to "control" a corporation will fetch a substantial premium.[6] Moreover, the majority's view is belied by Byrum's own conduct. He obviously valued control because he forbade the bank that served as trustee to sell the trust shares in these corporations without his—Byrum's—approval, whatever their return, their prospects, their value, or the trust's needs. Trust Agreement ¶ 5.15, App. 14.

In sum, the majority's discourse on § 2036 (a)(1) is an unconvincing rationalization for allowing Byrum the tax-free "enjoyment" of the control privileges he retained through the voting power of shares he supposedly "absolutely" and "unequivocally" gave up.

---

which the Court intended or attempted to narrow the meaning of § 2036 (a)(1).

[4] See, e. g., Honigman v. Green Giant Co., 208 F. Supp. 754, aff'd, 309 F. 2d 667 (CA8 1962), cert. denied, 372 U. S. 941 (1963); Essex Universal Corp. v. Yates, 305 F. 2d 572 (CA2 1962); Perlman v. Feldmann, 219 F. 2d 173 (CA2 1955).

[5] "[S]hareholders in a close corporation are usually vitally interested in maintaining their proportionate control . . . ." 1 F. O'Neal, Close Corporations § 3.39, p. 43 (1971). At least since Perlman v. Feldmann, supra, the academic dispute has not been over the existence of control, or its value, but, rather, over who is to benefit from the premium received upon its sale. See Leech, Transactions in Corporate Control, 104 U. Pa. L. Rev. 725 (1956); Hill, The Sale of Controlling Shares, 70 Harv. L. Rev. 986 (1957); Bayne, The Sale-of-Control Premium: The Disposition, 57 Calif. L. Rev. 615 (1969); Bayne, The Noninvestment Value of Control Stock, 45 Ind. L. J. 317 (1970).

[6] See, e. g., the transactions described in Bayne, supra, n. 5, at 617.

## III

I find no greater substance in the greater length of the majority's discussion of § 2036 (a)(2).

### A

Approaching the § 2036 (a)(2) problem afresh, one would think *United States* v. *O'Malley*, 383 U. S. 627 (1966), would control this case. In *O'Malley* the settlor "had relinquished all of his rights" to stock, but he appointed himself one of three trustees for each of the five trusts he created, and he drafted the trust agreement so that the trustees had the freedom to allocate trust income to the life tenant or to accumulate it for the remainderman "in their sole discretion." The District Court held that the value of securities transferred was includable in the settlor's gross estate under § 811 (c) and (d) of the Internal Revenue Code of 1939, as amended, § 811 (c)(1)(B) being the similarly worded predecessor of § 2036 (a), because the settlor had retained the power to allocate income between the beneficiaries without being constrained by a "definite ascertainable standard" according to which the trust would be administered. *O'Malley* v. *United States,* 220 F. Supp. 30, 33 (1963). The court noted "plaintiff's contention that the required external standard is imposed generally by the law of Illinois," but found this point to be "without merit."

> "The cases cited by plaintiff clearly set out fundamental principles of trust law: that a trust requires a named beneficiary; that the legal and equitable estates be separated; and, that the trustees owe a fiduciary duty to the beneficiaries. These statements of the law are not particular to Illinois. Nor do these requirements so circumscribe the trustee's powers in an otherwise unrestricted trust so as to hold such a trust governed by an external standard

and thus excludable from the application of § 811 (c) and (d)." 220 F. Supp., at 33–34.

It was another aspect of that case that brought the matter to the Court of Appeals, 340 F. 2d 930 (CA7 1964), and then here. We were asked to decide whether the lower court's holding should be extended and the accumulated income as well as the principal of the trust included in the settlor's taxable estate because the settlor had retained excessive power to designate the income beneficiaries of the shares transferred. We held that, though capable of exercise only in conjunction with one other trustee, the power to allocate income without greater constraint than that imposed "is a significant power . . . of sufficient substance to be deemed the power to 'designate' within the meaning of [the predecessor of § 2036 (a)(2)]." 383 U. S., at 631.

*O'Malley* makes the majority's position in this case untenable. *O'Malley* establishes that a settlor serving as a trustee is barred from retaining the power to allocate trust income between a life tenant and a remainderman if he is not constrained by more than general fiduciary requirements. See also *Commissioner* v. *Estate of Holmes,* 326 U. S. 480 (1946),[7] and *Lober* v. *United States,* 346 U. S. 335 (1953). Now the majority would have us accept the incompatible position that a settlor seeking tax exemption may keep the power of income allocation by rendering the trust dependent on an income flow he controls because the general fiduciary obligations of a director are sufficient to eliminate the power to designate within the meaning of § 2036 (a)(2).[8]

---

[7] See n. 3, *supra.*

[8] This incompatibility was readily perceived by the Internal Revenue Service. Shortly after *O'Malley* was handed down, it promulgated Rev. Rul. 67–54 (1967) which concluded:

"Where a decedent transfers nonvoting stock in trust and holds for the remainder of his life voting stock giving him control over the divi-

## B

The majority would prop up its untenable position by suggesting that a controlling shareholder is constrained in his distribution or retention of dividends by fear of derivative suits, accumulated earnings taxes, and "various economic considerations . . . ignored at the director's peril." I do not deny the existence of such constraints, but their restraining effect on an otherwise tempting gross abuse of the corporate dividend power hardly guts the great power of a controlling director to accelerate or retard, enlarge or diminish, most dividends. The penalty taxes only take effect when accumulations exceed $100,000, 26 U. S. C. § 535 (c); Byrum was free to accumulate up to that ceiling. The threat of a derivative suit is hardly a greater deterrent to accumulation. As Cary puts it:

> "The cases in which courts have refused to require declaration of dividends or larger dividends despite the existence of current earnings or a substantial surplus or both are numerous; plaintiffs have won only a small minority of the cases. The labels are 'business judgment'; 'business purpose'; 'non-inter-

---

dend policy of the corporation, he has retained, for a period which did not in fact end before his death, the right to determine the income from the nonvoting stock. If he also retains control over the disposition of the nonvoting stock, whether as trustee, by restriction upon the trustee, or alone or in conjunction with another, he has in fact made a transfer whereby he has retained for his life the right to designate the persons who shall possess or enjoy the transferred property or the income therefrom. Since under section 20.2036–1 (b)(3) of the Estate Tax Regulations it is immaterial in what capacity a power was exercisable by the decedent, it is sufficient that the power was exercisable in the capacity of controlling stockholder. Under the facts of this case, therefore, the decedent has made a transfer with a reserved power within the meaning of section 2036 (a) of the Code."

ference in internal affairs.' The courts have accepted the general defense of discretion, supplemented by one or more of a number of grounds put forward as reasons for not paying dividends or larger dividends . . . ." W. Cary, Cases and Materials on Corporations 1587 (4th ed. 1969).

And cf. *Commissioner* v. *Sunnen*, 333 U. S. 591, 609 (1948).

The ease with which excess taxes, derivative suits, and economic vicissitudes alike may be circumvented or hurdled if a controlling shareholder chooses to so arrange his affairs is suggested by the pay-out record of Byrum's corporations noted above.

## C

The majority proposes one other method of distinguishing *O'Malley*. Section 2036 (a)(2), it is said, speaks of the *right* to designate income beneficiaries. *O'Malley* involved the effort of a settlor to maintain a legal right to allocate income. In the instant case only the *power* to allocate income is at stake. The Government's argument is thus said to depart from "the specific statutory language" [9] and to stretch the statute beyond endurance by allocating tax according to the realities of the situation rather than by the more rigid yardstick of formal control.[10]

This argument conjures up an image of congressional care in the articulation of § 2036 (a)(2) that is entirely at odds with the circumstances of its passage. The 1931 legislation, which first enacted what is now § 2036 (a)(2) in language not materially amended since that date,

---

[9] This call for literalness strongly contrasts with the majority's § 2036 (a)(2) analysis, see n. 3, *supra*.

[10] The majority's argument ignores the fact that within a wide area of discretion Byrum had the "right" to allocate corporate income to purposes other than payment of dividends, and thus the "right" to shut off income to the trust's life tenants.

passed both Houses of Congress in one day—the last day of the session. There was no printed committee report. Substantial references to the bill appear in only two brief sections of the Congressional Record.[11] Under the circumstances I see no warrant for reading the words in a niggardly way.

Moreover, it appears from contemporary evidence that if the use of the word "right" was intended to have any special meaning it was to expand rather than to contract the reach of the restraint effected by the provision in which it appeared. The House Report on

---

[11] The intent of Congressmen and the care with which they measured the language which the majority thinks was carefully limited is suggested by the following:

"Mr. HAWLEY. Mr. Speaker, I ask unanimous consent for the present consideration of a joint resolution (H. J. Res. 529) relating to the revenue, reported from the Committee on Ways and Means. [The resolution, § 2036 (a)(1) and (2) substantially as they appear today, was read.]

"The SPEAKER. Is there objection?

"Mr. SCHAFER of Wisconsin. Reserving the right to object, I shall object unless the gentleman explains just what the bill is.

"Mr. HAWLEY. Mr. Speaker and gentlemen, the Supreme Court yesterday handed down a decision to the effect that if a person creates a trust of his property and provides that, during his lifetime, he shall enjoy the benefits of it, and when it is distributed after his death it goes to his heirs—the Supreme Court held that it goes to his heirs free of any estate tax.

.    .    .    .    .

"Mr. SCHAFER of Wisconsin. This is a bill to tax the rich man. I shall not object.

"Mr. COLLINS. I would like to have a little more explanation.

"Mr. SABATH. Reserving the right to object, all the resolution purports to do is to place a tax on these trusts that have been in vogue for the last few years for the purpose of evading the inheritance tax on the part of some of these rich estates?

"Mr. HAWLEY. It provides that hereafter no such method shall be used to evade the tax.

"Mr. SABATH. That is good legislation." 74 Cong. Rec. 7198.

the Revenue Act of 1932 notes in relation to amendment of the predecessor of § 2036 (a)(1) that:

> "The insertion of the words 'the right to the income' in place of the words 'the income' is designed to reach a case where decedent had the right to the income, though he did not actually receive it. This is also a clarifying change." H. R. Rep. No. 708, 72d Cong., 1st Sess., 47.

And see S. Rep. No. 665, 72d Cong., 1st Sess., 50, to the same effect.

I repeat the injunction of Mr. Justice Frankfurter, 25 years ago: "This is tax language and should be read in its tax sense." *United States* v. *Ogilvie Hardware Co.*, 330 U. S. 709, 721 (1947) (dissenting opinion).

Lest this by itself not be considered enough to refute the majority's approach, I must add that it is quite repugnant to the words and sense of our opinion in *O'Malley* to read it as though it pivoted on an interpretation of "right" rather than power. The opinion could hardly have been more explicitly concerned with the realities of a settlor's retained power rather than the theoretical legal form of the trust. Thus we said:

> "Here Fabrice [the settlor] was *empowered* . . . . This is a significant *power* . . . of sufficient substance to be deemed the *power* to 'designate' within the meaning of [the predecessor of § 2036 (a) (2)] . . . ." 383 U. S., at 631 (emphasis supplied).

And we said:

> "With the creation of the trusts, he relinquished all of his rights to income except the *power* to distribute that income to the income beneficiaries or to accumulate it and hold it for the remaindermen of the trusts." 383 U. S., at 632 (emphasis supplied).

And we spoke of:

> "This *power* he exercised by accumulating and adding income to principal and this same *power* he held until the moment of his death. . . ." 383 U. S., at 634 (emphasis supplied).

Other passages could be quoted.

## IV

Apparently sensing that considerations of logic, policy, and recent case law point to the inclusion of Byrum's trust in his estate, the majority would blunt these considerations by invoking the principle that courts should refrain from decisions detrimental to litigants who have taken a position in legitimate reliance on possibly outdated, but once established, case law. This principle is said to bring great weight to bear in Byrum's favor.

I need not quarrel with the principle. I think, however, that its application in this context is inappropriate.

The majority recites these facts: This Court has never held that retention of power to manage trust assets compels inclusion of a trust in a settlor's estate. In fact, *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339 (1929), specifically held a trust arrangement immune from taxation though the settlor retained power to decide how the trust assets were to be invested. Though *Northern Trust* was decided before the passage of § 2036 (a)(2), it has been followed by "several" more recent lower court decisions. Though most of the lower court decisions provide only the most oblique reference to circumstances like those of this case, a 1962 unappealed Tax Court decision, *Estate of King* v. *Commissioner*, 37 T. C. 973, is squarely in point.

On the basis of these two authorities, a 1929 Supreme Court decision and an unreviewed 1962 Tax Court decision, the majority concludes that there exists a "gener-

ally accepted" rule that Byrum might do what he had done here. It is said that the hypothesized rule "may" have been relied upon by "hundreds" of others; if so, its modification "could" have a serious impact, especially upon settlors who "happen" to have been controlling shareholders in closely held corporations and who "happen" to have transferred shares in those corporations to trusts while forbidding the trustee to sell the shares without approval and while retaining voting rights in those shares. Therefore the rule ought not to be "modified" by this Court.

## A

The argument, apparently, is that what "appear[s] to be established" should become established because it has appeared. Judges can and will properly differ on the questions of what deference to accord reliance on a well-established rule, but I doubt that we are precluded from reaching what would otherwise be a right result simply because in the minds of some litigants a contrary rule had heretofore "appear[ed] to be established." If the majority's approach were widely accepted, artful claims of past understanding would consistently suffice to frustrate judicial as well as administrative efforts at present rationalization of the law and every precedent— even at the tax court level—might lay claim to such authority that the Government and the tax bar could afford to leave no case unappealed.

## B

Of course, the reliance argument is doubly infirm if the majority's rule cannot be said to have "appear[ed] to be established." Did Byrum have a sound basis for calculating that there was no substantial risk of taxation when he persisted in retaining the powers and privileges described above?

1. Again the majority turns to *Reinecke* v. *Northern Trust Co.,* but it is no more credible to use *Northern Trust* as a foundation for Byrum's § 2036 (a)(2) position than it was to use it as a basis for the Court's § 2036 (a)(1) argument. *Northern Trust* was decided on January 2, 1929, two years and three months before Congress passed the first version of § 2036 (a)(2). Section 402 (c) of the Act of 1921, the provision under which *Northern Trust* was decided, proscribed only transfers in which the settlor attempted to retain "possession or enjoyment" until his death. It is thus not surprising that *Northern Trust* focused on the question of the settlor's "power to recall the property and of control over it *for his own benefit,"* 278 U. S., at 347 (emphasis added), and made no mention of possible tax liability because of a retained power to designate which beneficiaries would enjoy the trust income. A holding in this context cannot be precedent of "weight" for a decision as to the efficacy of a trust agreement made—as this trust was—27 years after the predecessor of § 2036 (a)(2) was enacted.

I note also that *Northern Trust* rests on a conceptual framework now rejected in modern law. The case is the elder sibling of *May* v. *Heiner,* 281 U. S. 238, a three-page 1930 decision which quotes *Northern Trust,* at length. *May* in effect held that under § 402 (c) a settlor may be considered to have fully alienated property from himself even if he retains the very substantial string of the right to income from the property so long as he survives. The logic of *May* v. *Heiner* is the logic of *Northern Trust.* As one authority has written:

> "When retention of a life estate was not taxable under the rule of *May* v. *Heiner,* it followed that mere retention of a right to designate the persons to receive the income during the life of the settlor was not taxable . . . ." 1 J. Beveridge, Law of Federal Estate Taxation § 8.06, p. 324 (1956).

That logic no longer survives. When three Supreme Court *per curiams* affirmed *May* on March 2, 1931, and thus indicated that this view would not be confined to its facts, the Treasury Department, on the next morning, wrote Congress imploring it to promptly and finally reject the Court's lenient view of the estate tax system. Congress responded by enacting the predecessor of § 2036 (a)(2) that very day. The President signed the law that evening. Thus the holding of *May* and the underlying approach of *Northern Trust* have no present life. I note further that though Congress has refused to permit pre-1931 trusts to be liable to a rule other than that of *May,* in 1949 this Court itself came to the conclusion that *May* was wrong, and effected "a complete rejection" of its reasoning. *Commissioner* v. *Estate of Church,* 335 U. S. 632,[12] 645.

I seriously doubt that one could have confidently relied on *Reinecke* v. *Northern Trust Co.* when Byrum drafted his trust agreement in 1958. This Court is certainly not bound by its logic, in 1972. I do not mean any disrespect, but as Mr. Justice Cardozo said about another case, *Northern Trust* is a decision "as mouldy as the grave from which counsel . . . brought it forth to face the light of a new age." B. Cardozo, The Growth of the Law, in Selected Writings 244 (M. Hall ed. 1947).

2. The majority argues that there were several lower court cases decided after the enactment of § 2036 (a)(2)

[12] In considering this and its companion case, *Estate of Spiegel* v. *Commissioner,* 335 U. S. 701 (1949), the Court in effect invited argument on whether *Northern Trust* itself should be overruled. Journal of the Supreme Court, O. T. 1947, pp. 296–297. Though the Court held for the Government without having to reach this issue, I note that in the 23 years since *Church* and *Spiegel* no opinion of this Court has once cited, much less relied upon, *Northern Trust.* Mr. Justice Reed, dissenting in *Church* and concurring in *Spiegel,* announced at the time that he thought these cases overruled *Northern Trust.*

upon which Byrum was entitled to rely, and it is quite true that cases exist holding that a settlor's retention of the power to invest the assets of a trust does not by itself render the trust taxable under § 2036 (a)(2). But the majority's emphasis on these cases as a proper foundation for Byrum's reliance is doubly wrong. First, it could not have evaded Byrum's attention and should not escape the majority that all cited prior cases—save *King* (the tax court case written four years *after* Byrum structured his trust)—involved retention of power to invest by the settlor's appointment of himself as a trustee; that is, they posed instances in which the settlor's retained power was constrained by a fiduciary obligation to treat the life tenant beneficiaries and remainderman beneficiaries exactly as specified in the trust instrument. Thus, the "freedom" to reallocate income between life tenants and remaindermen by, *e. g.*, investing in wasting assets with a high present return and no long-term value, was limited by a judicially enforceable strict standard capable of invocation by the trust beneficiaries by reference to the terms of the trust agreement. See *Jennings* v. *Smith,* 161 F. 2d 74 (CA2 1947), the leading case. Byrum must have realized that the situation he was structuring was quite different. By according himself power of control over the trust income by an indirect means, he kept himself quite free of a fiduciary obligation measured by an ascertainable standard in the trust agreement. Putting aside the question of whether the situation described *should* be distinguished from Byrum's scheme, surely it must be acknowledged that there was an apparent risk that these situations *could* be distinguished by reviewing courts.

Second, the majority's analysis of the case law skips over the uncertainty at the time Byrum was drafting his trust agreement about even the general rule that a settlor could retain control over a trust's investments

if he bound himself as a trustee to an ascertainable method of income distribution. While Byrum and his lawyer were pondering the terms of the trust agreement now in litigation, the Court of Appeals for the First Circuit was reconsidering whether a settlor could retain power over his trust's investments even when he bound himself to a fiduciary's strictest standards of disinterested obligation to his trust's beneficiaries. Early in 1958 the United States District Court for the District of Massachusetts had ruled that a settlor could not maintain powers of management of a trust even as a trustee without assuming estate tax liability. *State Street Trust Co.* v. *United States,* 160 F. Supp. 877. The estate's executor appealed this decision and argued it before the First Circuit panel on October 7, 1958. Byrum's trust agreement was made amidst this litigation, on December 8. On January 23, 1959, the First Circuit affirmed the District Court. 263 F. 2d 635.[13]

The point is not simply that Byrum was on notice that he risked taxability by retaining the powers he retained when he created his trust—though that is true. It is also that within a month of the trust's creation it should have been crystal clear that Byrum ran a substantial risk of taxation by continued retention of control over the trust's stock. Any retained right can be resigned. That Byrum persisted in holding these rights can only be viewed as an indication of the value he placed upon their enjoyment, and of the tax risk he was willing to assume in order to retain control.

The perception that a settlor ran substantial risk of estate tax if he insisted on retaining power over the

---

[13] The First Circuit again shifted its position on this question in *Old Colony Trust Co.* v. *United States,* 423 F. 2d 601 (1970), but this change is obviously irrelevant to the majority's argument as to the legitimacy of Byrum's reliance from 1958 to 1964.

flow of trust income is hardly some subtle divination of a latter-day observer of the 1958–1959 tax landscape. Contemporary observers saw the same thing. A summary of the field in the 1959 Tax Law Review concluded: "Until the law is made more definite, a grantor who retains any management powers is proceeding at his own risk. . . . [T]here is no certainty. . . ." Gray & Covey, State Street—A Case Study of Sections 2036 (a)(2) and 2038, 15 Tax L. Rev. 75, 102. The relevant subcommittee of the American Bar Association Committee on Estate and Tax Planning hardly thought reliance appropriate. It wrote in 1960 that:

> "The tax-wise draftsman must now undertake to review every living trust in his office intended to be excluded from the settlor's estate in which the settlor acts as a trustee with authority to:
> "1. Exercise broad and virtually unlimited investment powers . . . ." Tax-Wise Drafting of Fiduciary Powers, 4 Tax Counsellor's Quarterly 333, 336.

More could be said, but I think it is clear that the majority should find no solace in its reliance argument.

## V

The majority, I repeat, has erred in every substantial respect. It remains only to note that if it is wrong in *any* substantial respect—i. e., either in its § 2036 (a)(1) or (a)(2) arguments—Byrum's trust is by law liable to taxation.