ESTATE of Charles GILMAN, Deceased, et al., Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 28, Docket 76–4056.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1976.

Decided Dec. 30, 1976.

James B. Lewis, New York City, Maurice Austin, New York City, of counsel, for petitioners-appellees.

Ernest J. Brown, Washington, D. C., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Jonathan S. Cohen, Robert T. Duffy, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel, for respondent-appellant.

Before MOORE, FEINBERG and MESKILL, Circuit Judges.

## PER CURIAM.

In 1948, Charles Gilman, the decedent, transferred six shares of common stock, representing sixty percent of the outstanding voting power of the Gilman Paper Company, to a trust for the benefit of his children. Gilman was one of three co-trustees of the trust who had the power to vote the shares, as well as chief executive officer of the company. The question presented to us is whether the United States Tax Court was correct in holding that Gilman had not retained the enjoyment of these shares so as to require that they be included in his gross estate under section 2036(a)(1) of the Internal Revenue Code. The Commissioner of Internal Revenue endeavors to have us distinguish the facts of this case from those of *United States v. Byrum,* 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972), a precedent which would prevent inclusion of the shares in the gross estate. But we decline to do so, and affirm the Tax Court on the authority of the *Byrum* decision.

What is now the Gilman Paper Company ("company") was incorporated in New Hampshire in 1897. Isaac Gilman, the decedent's father, was the company's principal stockholder and president until his death. Charles joined his father in managing the business in 1917. In 1940, when Isaac was approximately 75 years old, the outstanding shares of the company were held entirely by Isaac, Charles, and Charles' four sisters,[1] though only Isaac and Charles held management positions.

Isaac, cognizant of his advancing age, was reluctant to place Charles in a position where he could take advantage of his sisters by exploiting the company. Charles, in turn, was worried about his minority status if his sisters and their husbands decided to

---

1. The shares were held as follows:

| Stockholder | Shares |
|---|---|
| Isaac Gilman | 15,999 |
| Charles Gilman (decedent) | 5,001 |
| Leah Shapiro (decedent's sister) | 1,000 |
| Sadie Collier (decedent's sister) | 1,000 |
| Celia Frank (decedent's sister) | 1,000 |
| Pauline Ballin (decedent's sister) | 1,000 |
| TOTAL | 25,000 |

disrupt the firm. To protect these respective interests, in 1940 Charles, Isaac, and the company entered into an agreement providing as follows: The company's capital stock was reclassified to provide for 25,000 non-voting preferred shares, to be exchanged share-for-share with the then outstanding stock, and ten shares of common stock, each of $100 par value. These ten shares would have the exclusive voting rights. Six of the ten shares were issued to Isaac and four to Charles. Upon Isaac's death, Charles would have the option of purchasing two shares of the common stock for $100 each from his father's estate. Charles' option to purchase the common shares was contingent upon his agreeing with the company that so long as he was employed by the company his salary would not exceed a ceiling amount computed by a special formula.[2]

Isaac died in 1944, owning 15,099 shares of preferred and six shares of common. Charles exercised his option to purchase two shares of common, and the remaining four shares were distributed equally among the four sisters. Then the company redeemed the 15,099 shares of preferred.[3] Charles was soon duly elected president and treasurer of the company.[4]

2. This ceiling amount formula, applied to past earnings of the company, was expected to, and for a few years did, give Charles a salary about $10,000 smaller than that which he had been receiving. He, nonetheless, accepted the agreement's terms in order to get potential control of the company.

3. The outstanding stock of the company was then held as follows:

| Stockholder | Common Shares | Preferred Shares |
|---|---|---|
| Charles Gilman | 6 | 5,241 |
| Leah Shapiro | 1 | 1,140 |
| Sadie Collier | 1 | 1,140 |
| Celia Frank | 1 | 1,140 |
| Pauline Ballin | 1 | 1,140 |
| Herman Gilman (nephew) | 0 | 100 |
| TOTAL | 10 | 9,901 |

4. In late 1945, the company's directors abandoned the salary formula for Charles established in the 1940 agreement and approved one giving him 10 per cent of the company's net profits over $200,000.

In 1948 Charles created an *inter vivos* trust for his sons by indenture between himself as settlor and himself, one of his sons, and his lawyer as trustees. He transferred to the trust his six shares of the company's common stock. The trust indenture provided that there should always be three trustees and that their decisions should be made by majority vote.[5] The trustees were given broad management and investment powers, including the right to vote the stock held in trust.[6]

From the creation of the trust in 1948 until his death in 1967, Charles was a trustee of the trust, a director of the company, and the company's chief executive officer. The company was profitable in each year from 1947 until his death, but the only income received by the trust in these years was the dividends paid on the six shares of common stock, approximately three hundred dollars.

The value of the common stock held by the trust was not included in the estate tax return of Charles Gilman. The Commissioner, however, determined that the six common shares were worth $24,500,000 and should have been included in the gross estate under section 2036(a)(1).[7] The case

5. Although Charles retained the right during his lifetime to appoint successor trustees, this power remained unexercised.

6. The indenture also provided that the trust should endure until the death of the survivor of Charles' two sons; that the trust income should be paid in equal shares to the sons; and that the corpus would be distributed upon the death of the surviving son to their issue *per stirpes*. Charles retained no possibility of reverter.

7. 26 U.S.C. § 2036 reads as follows:

(a) *General rule.*—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

was reviewed by the full Tax Court, which on November 10, 1975 held, with four dissenting judges, that the decision of *United States v. Byrum*, 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972), precluded a finding that the six shares were taxable. The Commissioner appeals from the Tax Court decision, which is reported at 65 T.C. 296 (1975).

In *United States v. Byrum, supra,* the decedent created an irrevocable trust to which he transferred some shares in three closely-held corporations which he controlled. There was to be a single corporate trustee with broad management powers, but Byrum reserved for himself the power to vote the shares, the power to disapprove the sale or transfer of the shares, the power to remove the trustee, and the power to appoint a successor corporate trustee. The trustee was authorized in its absolute discretion to pay the income of the trust to the beneficiaries. After the trust was created, Byrum owned approximately 50 per cent of the shares of each corporation in his own name, but because he could vote the stock held in trust, he had clear voting control of each corporation.

The Commissioner argued in *Byrum* that the decedent "enjoyed" the shares in trust because his resulting control of the corporations guaranteed his continued employment and salary as well as the right to determine questions of liquidation and merger. The Supreme Court rejected this analysis. It reasoned that the terms "possession and enjoyment" in § 2036(a)(1) do not apply where title is transferred irrevocably, where delivery of the property is complete, and the right to income from the property is relinquished. Charles Gilman's trust satisfies this standard.

(1) the possession or enjoyment of, or the right to the income from, the property . . . .

**8.** 408 U.S. at 149–50, 92 S.Ct. at 2397 (citation omitted).

**9.** We note that the Tax Reform Act of 1976, Pub.L.No. 94–455, signed into law on October

Simply stated, the Court held that the mere retention of the power to vote stock in a closely held corporation did not require the stock to be included in a decedent's gross estate. Moreover, the Court went on to say:

"Even if Byrum had transferred a majority of the stock, but had retained voting control, he would not have retained 'substantial present economic benefit,' . . . . The Government points to the retention of two 'benefits.' The first of these, the power to liquidate or merge, is not a *present* benefit; rather, it is a speculative and contingent benefit which may or may not be realized. Nor is the probability of continued employment and compensation the substantial 'enjoyment of . . . [the transferred] property' within the meaning of the statute." [8]

Indeed, the facts of Charles Gilman's trust actually add strength to the taxpayer's case, for here the decedent's authority over the trust was at least formally limited by the existence of the two co-trustees.

The Commissioner makes a sophisticated attempt to distinguish this case from the *Byrum* decision, prompted in large part by a desire to limit the somewhat rigid approach of *Byrum*.[9] But given the *Byrum* holding, we feel that the Tax Court's decision in this case should be affirmed.

4, 1976, and effective in this regard to transfers after June 22, 1976, amends § 2036 to add the following sentence:

"For purposes of [§ 2036(a)], the retention of voting rights in [transferred] stock shall be considered to be a retention of the enjoyment of such stock."