ESTATE OF ABRAHAM COHEN, DECEASED, MAURICE M. COHEN, WILLIAM P. COHEN AND NORMAN D. COHEN, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21028–80.     Filed December 20, 1982.

---

*David R. Andelman, J. Thomas Price,* and *Arnold R. Cutler,* for the petitioners.
*Barry J. Laterman,* for the respondent.

RAUM, *Judge*: The Commissioner determined a $435,158.78 deficiency in petitioner's Federal estate tax liability. After concessions, the sole issue remaining for decision is whether certain common and preferred shares in a Massachusetts realty trust, which the decedent gave outright during his lifetime to his children, grandchildren, and great-grandchildren, are includable in his estate under section 2036(a)(2) or section 2038(a)(1), I.R.C. 1954, by reason of his position as a trustee of the realty trust.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

The decedent, Abraham Cohen, died in Miami Beach, Fla., on February 19, 1977, at the age of 90. At the time of his death, he was a Massachusetts resident. The executors of his estate are his three sons, Maurice M. Cohen, William P. Cohen, and Norman D. Cohen, who were then 61, 59, and 54 years old, respectively.[1] At their father's death, William and Norman Cohen both resided in Massachusetts and Maurice Cohen resided in Florida, and the business address of petitioner was that of its lawyer in Boston, Mass. The estate tax return was timely filed with the Internal Revenue Service Center in Andover, Mass.

The decedent, who was born in Russia, came to the United States at the age of 23 and worked in the harness-making business. He eventually opened a "harness-making store" in Cambridge, Mass. That enterprise later became the Lechmere Tire Shop when automobiles replaced horses as the dominant

---

[1] In addition to his three sons, the decedent's survivors consisted of a daughter, Nan, then aged 70, and a number of grandchildren and great-grandchildren.

mode of transportation. Eventually, the decedent's sons joined him in the business, and after World War II, it was incorporated as the Lechmere Tire & Sales Co. (Lechmere). It had expanded by then to carry radios, appliances, etc. The stock of the corporation was held by the decedent and his three sons.

By 1955, Lechmere required larger quarters. The decision was made to purchase a nearby garage and lot in Cambridge and convert them into a combination retail establishment and warehouse, with additional space for parking. On the advice of counsel, a Massachusetts realty trust was created on October 28, 1955, to hold these properties and lease them to Lechmere. The trust was capitalized with $2,000, consisting of $500 contributions from the decedent and each son, and the shares of the trust were divided equally among them. The initial cash contributions were the only ones ever made to the trust, although a number of additional properties were purchased between 1958 and 1976, and in the beginning, at least practically all of the funds for the real estate purchases were borrowed. The name of the trust was "The Mezuries Realty Trust," and from the date of its creation until the decedent's death, its trustees were the decedent and his three sons.

In 1964, the Lechmere corporation was recapitalized, with the result that the common stock was thereafter held only by the sons. The "value of the corporation * * * was placed in preferred shares," which were apparently held equally by father and sons. Despite this shift in ownership, which eliminated the decedent as a voting stockholder, the decedent continued as a director of the corporation.

The lease between Lechmere and the Mezuries Realty Trust was set out in a formal instrument, and it called for a base rental plus a percentage of sales above a certain level. The trust acquired other properties in Cambridge between 1955 and Abraham Cohen's death in 1977, but these were acquired at least in part for expansion of the Lechmere store, and throughout this period, Lechmere was the trust's only tenant of any consequence. By 1970, Lechmere had opened an additional store, and shortly thereafter two more stores were opened. However, the trust was the lessor for only the original store; the other three stores were operated in space rented from third parties.

Lechmere was acquired by the Dayton-Hudson Co. in 1969.

This event had no effect on the lease between Lechmere and the trust, since Lechmere continued to exist as a wholly owned subsidiary of Dayton-Hudson. Maurice Cohen retained his position as president of Lechmere, and his brothers remained vice presidents of that company. The decedent continued as an "assistant treasurer," which was apparently no more than a titular position, although it was his practice to come to the store from time to time and he remained on the corporation's payroll until 1976.

On December 18, 1970, the decedent and his sons amended the Mezuries Realty Trust (Mezuries) in order to create an additional class of beneficial interests. The restructuring took place as follows: A class of 30,000 nonvoting preferred shares was issued as a dividend on the common shares, at the rate of 1,500 preferred shares for each share of common. The result was the issuance of 7,500 preferred shares to each of the four holders of the common shares, with each preferred share having a par value of $100. The common shares were changed to no-par value, and were given exclusive voting rights on a basis of one vote for each common share held. Thus, immediately following the 1970 restructuring, the decedent and each of his sons held 7,500 preferred shares, with a par value of $750,000, and each held 5 common shares, which had no par value but represented one-quarter of the total voting power.

This rearrangement of the beneficial interests in the trust appears to have been carried out for two reasons. First, it enabled the decedent to transfer his voting rights to his sons, who were actively managing the affairs of both Mezuries and the Lechmere corporation. Accordingly, on December 24, 1970, some 6 days after the amendment of the trust agreement, the decedent gave to each of his three sons $1\frac{2}{3}$ common shares of Mezuries. After this gift, the sons were the only holders of the common shares of Mezuries.

The restructuring also facilitated an accommodation of the decedent's wish to make inter vivos dispositions of his Mezuries' interest to his daughter, his grandchildren, and his great-grandchildren. With the separation of his voting rights, which were given to his sons, from the "value" of his beneficial interest, the decedent could comfortably distribute the preferred shares among his other descendants without concern for those descendants interfering in the management of the

trust. Thus, on December 24, 1970, the same day on which the 5 common shares were given to the sons, the decedent gave 2,700 preferred shares to a total of 18 persons, including his only daughter, Nan Weinstein. During the next 28 months, the decedent made gifts of a total of 4,650 preferred shares, with the result that as of April 16, 1973, he had given 7,350 of his 7,500 preferred shares to a total of 23 descendants (excluding his sons) in the three succeeding generations. From this time until his death, the decedent held but 150 preferred shares in Mezuries.

The trust agreement gave the decedent and his co-trustees broad management powers in respect of the real estate. As amended and in effect at the time of the disposition of the shares, the agreement also included the following pertinent provisions:

VII. CESTUIS QUE TRUSTENT

(a). The beneficial interests of the cestuis que trustent shall be represented by transferable shares which shall consist of two classes, preferred shares and common shares. Preferred shares shall have a par value of one hundred dollars ($100) per share. The common shares shall be without par value. The holders of the common shares shall have exclusive voting power. A holder of common shares shall have one vote for each common share held. There shall be no limitation on the number of shares of either of the classes above referred to which the trustees may from time to time cause to be issued. The trustees may issue shares of either class to such persons, at such times and for such consideration as they may determine from time to time.

(b). The holders of the preferred shares shall be entitled to preference to the extent of the par value thereof in the liquidation of the trust. They shall be entitled to non-cumulative dividends at the annual rate of six dollars and fifty cents ($6.50) per share. No dividend shall be declared upon the common shares unless the current annual preferred dividend shall have been declared and paid.

(c). The trustees shall have the right to redeem its 6.5% preferred stock, or any number of shares thereof, issued and outstanding, at any time by paying to the holders thereof the sum of $100 per share. The trustees shall also have the right at any time to purchase all or any part of its 6.5% preferred stock issued and outstanding by paying to the respective holders thereof the sum of $100 for each share of such stock redeemed together with the amount of such accrued dividends as may have accumulated thereon at the time of redemption.

The trustees shall have full power and discretion to select from the outstanding 6.5% preferred stock of the trust particular shares for redemption or purchase, and its proceedings in this connection shall not be subject to attack except for actual and intentional fraud. In all instances, the trustees shall have complete authority to determine upon and take the

necessary proceedings fully to effect the purchase or redemption of the shares selected for redemption, and the cancellation of the certificates representing such shares. Upon the completion of such proceedings, the rights of holders of the shares of such preferred stock which have been redeemed and called in shall in all respects cease, except that such holders shall be entitled to receive the redemption price for their respective shares.

(d). Subject to the rights of the holders of the preferred shares, the holders of the common shares shall be entitled to such distribution of income and/or capital as the trustees from time to time determine, and upon the termination of the trust shall be entitled to distribution of the trust property in the method hereinafter set forth.

          *      *      *      *      *      *      *

(o). Any holder of common or preferred shares of this trust who desires to sell or transfer any such shares shall offer to sell such shares to the trustees or their nominee in accordance with these restrictions. * * * If the trustees of this trust decide to enforce these restrictions as to all or any part of such shares thus offered or acquired, they shall, within ten (10) days after receipt of such offer, mail to the holder notice of their decision.

Within thirty (30) days after the mailing of the notice of their decision, the trustee shall determine the value of such shares and their determination shall be conclusive and binding. They shall give immediate notice of their decision to the Cestui Que Trust.

          *      *      *      *      *      *      *

VIII. PERSONAL LIABILITY OF TRUSTEES AND CESTUIS QUE TRUSTENT. The Trustees shall have no power to bind the Cestuis Que Trustent personally, and all persons or corporations extending credit to, contracting with, or having any claim against the Trustees shall look only to the funds and property of the Trust for payment under such contract or claim, or for the payment of any debt, damage, judgment, or decree, or of any money that may otherwise become due or payable to them from the Trustees, so that neither the Trustees nor the Cestuis Que Trustent, present or future, shall be personally liable therefor. In every written order, contract, or obligation which the Trustees shall give or enter into, it shall be the duty of the Trustees to refer to this declaration and to stipulate that neither the Trustees nor the Cestuis Que Trustent shall be held to any personal liability under or by reason of such order, contract, or obligation.

IX. TRUSTEES' LIABILITY, NO BOND REQUIRED. Each Trustee shall be responsible only for his own wilful [sic] and corrupt breach of trust, and not for any honest error of judgment, and not one for another. No Trustee shall be required to give a bond.

X. ALTERATION AND AMENDMENT OF TRUST AGREEMENT. The Trustees may, with the consent of the Cestuis Que Trustent, alter or add to this Declaration of Trust. * * *

XI. RESIGNATION, VACANCY, NEW APPOINTMENT, TEMPORARY ABSENCE, AND POWER OF ATTORNEY. Any Trustee may resign his Trust by a written instrument signed and sealed by him. * * * Any vacancy occurring from any cause, at any time, in the number of said Trustees shall be filled by the remaining Trustees. Until such vacancy is filled, or while any

Trustee is absent from the Commonwealth of Massachusetts, or physically or mentally incapable, by reason of disease or otherwise, the other Trustees shall have all the powers hereunder, and the certificate of the other Trustees of such vacancy, absence or incapacity shall be conclusive. In the event that the office of Trustee is vacant of all Trustees then such vacancies may be filled by the Probate Court of Middlesex County. In case of a vacancy or of the appointment of a new Trustee or Trustees the Trust Fund shall immediately vest in the remaining Trustees or in the new Trustee or Trustees, jointly with the remaining Trustee or Trustees, as the case may be. Any Trustee may, by power of attorney, delegate his powers, for a period not exceeding six months at any one time, to any of the other Trustees hereunder. The term "Trustees" used in this agreement shall be deemed to mean those who are or may be Trustees for the time being.

\* \* \* \* \* \* \*

XIII. TERMINATION. At and upon the expiration of fifty (50) years after the day of the date hereof, or at such earlier time as the Trustees with the consent of the Cestuis Que Trustent may decide, the Trustees shall terminate this Trust by dividing the Trust Fund, or the proceeds thereof, among the Cestuis Que Trustent, being first duly indemnified for any outstanding obligation or liability, and shall thereupon be forthwith discharged.

It appears from the record that the decedent did not participate in decision making in respect of Mezuries (or Lechmere) from the inception of the trust in 1955 until his death. Although his sons kept him informed of their business activities, the scope of those activities had apparently surpassed his understanding. Moreover, the decedent never learned to read or write English, and though his signature appears on the trust documents, it was unlikely that he fully comprehended the nature of the trust and his rights and duties as a trustee.

The Commissioner determined that the five common shares of Mezuries given by the decedent to his sons, and the 7,350 preferred shares given to his daughter, grandchildren, and great-grandchildren, are includable in his gross estate under section 2036(a)(2) or section 2038(a)(1). In the deficiency notice, the common shares were valued at $646,860 and the preferred shares at $735,000. Petitioner has stipulated that these are the correct values for the shares as of the date of the decedent's death.

## OPINION

Between December 24, 1970, and April 16, 1973, the decedent made gifts of his entire holding of common shares

and 7,350 (out of his 7,500) preferred shares of the Mezuries Realty Trust. The common shares were divided equally among his three sons. The preferred shares were given to his daughter, his grandchildren, and his great-grandchildren. All the gifts were irrevocable. They were made outright and not in trust, and the donees had full power to sell the donated shares subject only to the condition that, prior to any proposed sale, the Mezuries Trust was to have a right of first refusal. During the entire period from the dates of the gifts and continuing until his death in 1977, the decedent and his three sons were the trustees of Mezuries. As such, their powers included the following: (1) To determine whether a non-cumulative, $6.50 dividend would be declared and paid each year on the preferred shares; (2) if a preferred dividend were declared and paid in a given year, to determine whether a dividend would be declared and paid on the common shares; (3) to redeem any or all preferred shares at any time for par value ($100 per share) plus accrued dividends; (4) to exercise a right of first refusal upon a proposed sale by a shareholder of either common or preferred shares, and if such right were exercised, to determine conclusively the value of the shares in question; (5) to alter or add to the trust agreement, with the consent of the "Cestuis Que Trustent"; and (6) to terminate the trust prior to its expiration date, again with the consent of the "Cestuis Que Trustent."

The issue presented is whether these powers held by the decedent as a co-trustee of Mezuries are sufficient to require inclusion of the donated shares, common and preferred, in his gross estate pursuant to section 2036(a)(2) or section 2038(a)(1) of the Internal Revenue Code of 1954.[2] The Government

---

[2]As in effect when the transfers herein were made, those provisions read in relevant part:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

    \*        \*        \*        \*        \*        \*        \*

    (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

contends that the dividend power and the redemption power each constitute "the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom." Sec. 2036(a)(2). Furthermore, it is the Government's position that the shares are also includable under section 2038(a)(1), as an interest in property transferred by the decedent "where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power * * * by the decedent alone or by the decedent in conjunction with any other person * * * to alter, amend, revoke, or terminate." We address these issues in turn.

*Section 2036(a)(2).*—In respect of annual dividends on the trust shares, the trust agreement provides for a $6.50 noncumulative preferred dividend, and a common dividend only if the preferred dividend has been declared and paid. As the Government views it, these provisions enable the trustees to shift the enjoyment of trust income between the classes of shareholders by arbitrarily declaring or withholding dividends on the different classes of shares in different years. For example, if a preferred dividend is withheld it is irrevocably lost to those shareholders, because the dividend is non-cumulative and they have no equity in trust assets beyond the $100-per-share preference. Conversely, any preferred dividend declared and paid reduces the equity of the common shareholders, who would otherwise receive those assets during the term of the trust or upon termination. Thus, it is contended, the dividend power of the decedent and his co-trustees gave them the "right" to designate the persons who would enjoy trust income.

In *United States v. Byrum*, 408 U.S. 125 (1972), shares of three corporations were transferred to an irrevocable trust,

---

SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

but the settlor (Byrum) retained the right to vote the shares. Without the transferred shares, Byrum had a majority voting interest in only one of the corporations, but with those shares he had the right to vote not less than 71 percent of the common stock of each. The Government argued that Byrum's power to elect the directors of each corporation gave him control over dividend policy, and thus the right to "'regulate the flow of income to the trust.'" 408 U.S. at 132. However, the court rejected the contention that this de facto power to affect dividend policy was "tantamount to the right to designate the persons who shall enjoy trust income" (408 U.S. at 144), emphasizing the fiduciary obligations imposed upon both majority shareholders and corporate directors under the applicable local law. In view of these fiduciary constraints, Byrum's theoretical power in respect of dividends was not an "ascertainable and legally enforceable" right (408 U.S. at 136–137), and was thus not a "right" within the meaning of section 2036(a)(2).

While we are concerned here with a realty trust rather than a corporation, these entities are sufficiently similar to bring this case within the rationale, if not the holding, of *Byrum*. Mezuries meets the criteria for taxation as an association rather than a trust under the test set out in *Morrissey v. Commissioner*, 296 U.S. 344, 359 (1935), and adopted in section 301.7701–2(a)(1), Proced. & Admin. Regs. There were present here the familiar features calling for the classification of Mezuries as an association taxable as a corporation, such as centralized management, continuity of enterprise regardless of ownership of the equitable interests in the trust, transferability of the shares, limited liability, etc. The trustees were certainly associates with "an objective to carry on business and divide the gains therefrom." See sec. 301.7701–2(a)(2), Proced. & Admin. Regs. Cf. *Hynes v. Commissioner*, 74 T.C. 1266, 1276–1286 (1980). Indeed Mezuries resembles the real estate trusts in two of the companion cases decided at the same time as *Morrissey*, namely, *Swanson v. Commissioner*, 296 U.S. 362 (1935); and *Helvering v. Coleman-Gilbert*, 296 U.S. 369 (1935). Mezuries, in fact, filed corporate income tax returns over the years, which were accepted by the Internal Revenue Service, and there is not even a hint that either the Government, or Mezuries, itself, or the trustees or shareholders in

any way disagree with the treatment of Mezuries as a corporation for purposes of Federal income taxes. In addition, Massachusetts statutes treat trusts with transferable shares in a manner comparable to corporations for a variety of purposes (see generally Mass. Gen. Laws ch. 182 (West 1958)), and this has been recognized by the Massachusetts courts (*Swartz v. Sher*, 344 Mass. 636, 639, 184 N.E. 2d 51, 53 (1962)):

> Trusts with transferable shares have been submitted to substantial statutory regulation (see G.L. c. 182) in many respects similar to the regulation of corporations. To be sure such trusts are not corporations, nor are they entities apart from the trustees. (Citations omitted.) Nevertheless, this type of business organization (citations omitted) in practical effect is in many respects similar to a corporation.

Finally, the very fact that we are concerned here with the declaration of *dividends* on *shares* representing interests in the entity bolsters the corporate analogy, and thus the relevance of *Byrum*.

In *Byrum*, the critical impediments to the transformation of the power to affect dividend policy into a right to designate enjoyment were the fiduciary obligations imposed by local law on Byrum as a controlling shareholder and on the corporate directors he could elect. Therefore, the issue here must turn upon the construction of this trust agreement under Massachusetts law. If the agreement may be said to give the trustees unlimited discretion in this respect, so that dividends could be arbitrarily and capriciously withheld or declared, then the dividend power would constitute a "right" under section 2036(a)(2); if, on the other hand, the power is circumscribed by cognizable limits on the exercise of discretion, then no such "right" exists.

In the original trust agreement adopted in 1955, the only statement in regard to the dividend power was: "That the Trustees shall declare dividends from the net income of the Trust Fund among the Cestuis Que Trustent, and their decision in respect of the amount of dividends * * * shall be final." The language "shall declare" implies an expectation that dividends would be declared regularly, subject to the availability of earnings and the exercise of sound business judgment, yet the amount of the dividend was left to the trustees' discretion. In the amended agreement, the provision is more specific in respect of the preferred shares, stating that

those shareholders "shall be entitled to non-cumulative dividends at the annual rate of six dollars and fifty cents ($6.50) per share." While it is true that these terms do not mandate an annual dividend on the preferred shares, it is clear that they contemplate a declaration of a dividend in that amount each year if business circumstances allow for it. And a fair reading of the instrument would permit the omission of a dividend (or reduction in amount) only if the determination to eliminate or reduce the dividend were made in good faith and in the exercise of a bona fide business judgment. This reading is consistent with the apparent purpose for creation of the shares, which was to enable the decedent to transfer to his many descendants an interest in the trust, while limiting control of and equity in the trust to his sons, alone. Thus, the preferred dividend was made a prerequisite to a common dividend, which was a further protection of the preferred shareholders' income interest.

In our judgment, a fair construction of this trust agreement is that the trustees' discretion in respect of dividends was intended to be limited, and we are not convinced that a Massachusetts court would decline to enforce such limitations. In *Friedman v. Gorin*, 359 Mass. 745, 269 N.E.2d 246 (1971), the supreme judicial court held that a decision by the trustees of a real estate trust to liquidate a low-interest mortgage rather than distribute accumulated funds as dividends "did not amount to an abuse of the sound discretion of the trustees." 269 N.E.2d at 247. Thus, it was within the discretion of the trustees to prefer a business opportunity over a larger dividend, but there is no implication that the trustees could simply forego dividends without justification. In fact, the court's willingness to evaluate the soundness of the exercise of discretion indicates that there must be limits on the discretion of business trustees in respect of dividends. And that court has stated that, while it may be slower to remove a business trustee than an ordinary trustee (*Massa v. Stone*, 346 Mass. 67, 190 N.E.2d 217, 223 (1963)),

in appropriate cases the power of removal may be exercised, as in other trusts, because of a risk of serious harm to the beneficiaries, possible conflict of interest, improper disregard of the interests of the beneficiaries or of the corporation, serious breaches of trust, and comparable circumstances. (Citations omitted.)

In view of the perceived limitations on the dividend power in the trust agreement in question, and the apparent willingness of the Massachusetts courts to hold business trustees to a fair standard of conduct,[3] we conclude that the decedent and his sons did not have the power to withhold dividends arbitrarily. Thus, they did not have an "ascertainable and legally enforceable" *right* to shift income between the classes of shareholders, and the dividend power does not require inclusion of either the common or preferred shares in the decedent's estate under section 2036(a)(2). We think *Byrum* is controlling.[4]

The Government also contends that the power of the trustees to redeem the preferred shares at par value is a right to designate enjoyment under section 2036(a)(2). It is stipulated, however, that the fair market value of these shares was equal to their par value at the decedent's death, and we fail to see how enjoyment of the shares would be diminished by the payment of fair market value in exchange therefor. This would simply give the beneficiary more freedom of action in respect of the transferred property, while section 2036 is designed to draw into the estate property of which the decedent has in some way kept control. The Government's contention must be rejected.

*Section 2038(a)(1).*—Pursuant to section 2038(a)(1), the gross estate includes any interest in transferred property where at the date of his death a decedent (in conjunction with any other person) could change enjoyment of the property by means of a

---

[3]Moreover, we think that the Massachusetts courts would be even more alert to look into the existence of business judgment of the trustees where the exercise of the trustees' discretion might operate to the disadvantage of one group of beneficiaries in favor of another group.

[4]The facts in this case make it a much weaker one for the Government than *Estate of Gilman v. Commissioner*, 65 T.C. 296 (1975), affd. 547 F.2d 32 (2d Cir. 1976). By reason of the unusual facts there presented, a sharp division arose within this Court. The dissenters were of the view that the decedent had retained the actual enjoyment of the transferred shares which made sec. 2036(a)(1) applicable. However, there was no disagreement between the majority and the dissenters as to the applicability of *Byrum* under sec. 2036(a)(2), and in view of the reliance by the majority upon *Byrum* in respect of both subsections (a)(1) and (a)(2), the controlling effect of *Byrum* in the present case follows a fortiori from *Gilman*. Here, there is no contention whatever that the decedent retained actual enjoyment of the transferred shares. Indeed, the record shows that he had long ceased to exercise any meaningful control over the enterprise, and that it had, in fact, reached the point where it had largely surpassed his comprehension. His role was primarily of a ceremonial nature without any real exercise of business control or even any significant participation in the business, which was, in fact, being run by his three sons.

power to "alter, amend, revoke, or terminate." According to the Government, the alteration and termination provisions in the Mezuries trust agreement gave the decedent in this case such a power (in conjunction with his co-trustees), and the common and preferred shares are therefore includable in his gross estate. We do not agree.

Section 20.2038–1(a), Estate Tax Regs., states that section 2038 does not apply—

(2) If the decedent's power could be exercised only with the consent of all parties having an interest (vested or contingent) in the transferred property, and if the power adds nothing to the rights of the parties under local law;

Petitioner argues that this exception is applicable here, because the trust agreement plainly provides for alteration of the agreement or termination of the trust only "with the consent of the Cestuis Que Trustent." The Government contends, however, that while the term "Cestuis Que Trustent" may have included all of the shareholders prior to amendment of the trust agreement in 1970, such was not the case afterwards in view of the fact that the amendment bifurcated the shares into voting (common) and nonvoting (preferred). According to the Government, after 1970 it was only the common shareholders whose consent was required.

The 1970 amendment which created the two classes of shares in no way purported to change the alteration provision or the termination provision, and in the absence of any persuasive indications to the contrary, we think that the amendment must be construed to leave intact such critical rights. A fair construction of the amended agreement is that the absence of a vote for the preferred shareholders is meant to exclude them from participation in the regular business affairs of the trust, but that their consent must nevertheless be obtained in respect of such fundamental matters as alteration of the agreement and termination of the trust. And this construction is consistent with the language of the amendment, which states that "The beneficial interests of the cestuis que trustent shall be represented by transferable shares which shall consist of two classes." Thus, the two classes of shares *together* represent the "cestuis que trustent," and these are the same "cestuis que trustent" whose consent is required. Therefore, even after 1970, the agreement could be altered or the trust terminated only with the consent of "all parties

having an interest." Because these provisions appear to add nothing to the rights of the parties under Massachusetts law (see *Ryan v. McManus*, 323 Mass. 221, 80 N.E.2d 737, 742 (1948); *Commissioner of Corporations, Etc. v. Second Nat. Bank*, 308 Mass. 1, 30 N.E.2d 889, 895 (1941)),[5] section 2038 is rendered inapplicable here by section 20.2038–1(a)(2), Estate Tax Regs., quoted *supra*.[6]

For the foregoing reasons, neither the common nor preferred shares are includable in the decedent's gross estate. Because of concessions made by each party,

*Decision will be entered under Rule 155.*

---

[5]These Massachusetts decisions were concerned with regular trusts rather than realty trusts. Nevertheless, they seem particularly relevant here, because the Mezuries shares were transferable and in each of these cases the Supreme Judicial Court stressed the connection between the assignability of beneficial interests and the power of the beneficiaries to alter or terminate the trust. For example, in *Commissioner of Corporations, Etc. v. Second Nat. Bank,* the court stated (30 N.E.2d at 895):

"The power conferred by law upon the beneficiaries acting together to terminate or modify the trust is closely analogous with respect to each beneficiary, to the power of such beneficiary to assign his interest in the trust estate."

See also *Ryan v. McManus,* 80 N.E.2d at 742.

[6]Even if the Government were correct in its interpretation of the amended trust agreement, so that the consent of only the holders of the common shares was required in order to alter the agreement or terminate the trust, the common shares transferred by the decedent in 1970 would in any event be excluded from his gross estate by reason of sec. 20.2038–1(a)(2), Estate Tax Regs.